**Donna René CHANCE, Appellant,**

v.

**Gene Ray CHANCE, Appellee.**

**No. 09–93–260 CV.**

Court of Appeals of Texas,
Beaumont.

Submitted Oct. 20, 1994.

Decided July 20, 1995.

Dissenting Opinion by Justice
Brookshire Oct. 12, 1995.

Order Overruling Rehearing and
Reinstating Opinion Oct. 26, 1995.

Pamela E. George, Houston, for appellant.

Bruce Neill Smith, Beaumont, for appellee.

Before WALKER, C.J., and
BROOKSHIRE [1] and BURGESS, JJ.

---

1. The Honorable Jack Brookshire, sitting by assignment pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

## OPINION

WALKER, Chief Justice.

This modification of child custody case focuses upon the future welfare of two young boys, Zachary and Matthew, both currently under the age of six years. Appellant, Donna René Chance, is the mother and appellee, Gene Ray Chance, is the father. Mr. Chance brought suit to modify prior judgment of the trial court which named Donna René Chance as the managing conservator and Gene Ray Chance as the possessory conservator.

The case was tried before a jury which returned its verdict naming Gene Ray Chance as sole managing conservator of the children. The trial court signed its modification order on June 15, 1993. This appeal has been timely perfected with appellant seeking remand for new trial, with additional request that she be returned to her pre-trial status as managing conservator pending new trial.

Appellant's portrayal of the case is: "Quite simply, this case is a tragedy—not only for DONNA, a mother who has lost custody of her children, but also for Zachary and Matthew who have been torn from their mother, her protection, and love."

Appellee's portrayal is: "The jury in this case meted out justice. They sifted the facts and made a reasoned, just decision."

At the time of the original divorce between Donna René Chance and Gene Ray Chance, Donna Chance was named the sole managing conservator of the two minor children. Section 14.08(c)(1), Texas Family Code, provides:

After a hearing, the court may modify an order or a portion of a decree that: (1) designates a sole managing conservator if:

(A) the circumstances of the child, sole managing conservator, possessory conservator, or other party affected by the order or decree have materially and substantially changed since the date of the rendition of the order or decree to be modified; and

(B) the retention of the present sole managing conservator would be injurious to the welfare of the child; and

(C) the appointment of the new sole managing conservator would be a positive improvement for the child; . . . .

TEX.FAM.CODE ANN. § 14.08(c)(1) (Vernon Supp.1995).

Obviously, it is no small step, from an evidentiary standpoint, to effectively preponderate, conjunctively, the three requirements of Section 14.08(c)(1). This is especially so in situations such as the present where the original Judgment of Divorce was signed on the 26th day of August, 1991, and modification of that judgment appointing Donna René Chance as sole managing conservator is sought to be changed less than one year after entry of judgment. Appellee, Gene Ray Chance filed his Amended Motion to Modify in Suit Affecting the Parent–Child Relationship, on August 10, 1992. It is incumbent upon this Appellate Court to determine whether or not Gene Ray Chance met his burden of establishing the three required elements of Section 14.08(c)(1) by a preponderance of the evidence as properly instructed by the trial court. Regarding the burden of proof, the trial judge below provided the jury with the following instruction:

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless you are instructed that the answer must be based on clear and convincing evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term "preponderance of the evidence" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires an answer other than "Yes" or "No", your answer must be based on a preponderance of the evidence unless you are instructed that the answer must be based on clear and convincing evidence.

The trial court gave no special instruction on any jury question requiring evidence of a clear and convincing nature. Nor, does appellant or appellee contend for application of a different standard of evidentiary proof than that of "a preponderance of the evidence." Thus, our review of this case and the record

before us shall be pursued with recognition of appellee's burden of proving by a preponderance of the evidence, conjunctively, the three requirements of Section 14.08(c)(1).

Appellant brings to this Court eleven points of error. We choose to address appellant's point of error nine at the inception since point of error nine addresses the "no evidence" and "insufficiency of the evidence" questions.

Point of error nine contends:

A. There is no evidence to support submission of jury questions one, two, and four.

B. There is no evidence to support the jury's response to questions one, two, and four.

C. The evidence is insufficient to support the finding of the jury in response to questions one, two, and four.

D. The finding of the jury in response to questions one, two, and four is so against the great weight and preponderance of the evidence as to be manifestly unfair and unjust.

E. The verdict included conflicting findings; specifically that Gene should be appointed sole managing conservator, while at the same time the jury found that Gene had engaged in acts that were emotionally or physically endangering to the children.

■ Appellant correctly contends that Gene Chance had the burden of proving that there had been a material and substantial change since the date of the original judgment, *and* that the retention of Donna Chance as managing conservator would be injurious to the welfare of the children, *and* that the appointment of a new sole managing conservator would be a positive improvement for the children. However, item "D" of appellant's point of error nine constitutes a misapplication of the burden of proof.

■ A complaint that a finding is against the great weight and preponderance of the evidence is proper where appellant had the burden of proof and is thus attacking the factual sufficiency of a failure to find on a particular issue. Recognizing that appellee, Gene Chance had the burden of proof, we shall disregard item "D" of appellant's point of error nine.

■ Paragraphs A and B of appellant's point of error nine constitute "no evidence" attacks upon the record. Our scope of review requires that we consider only the evidence and reasonable inferences that tend to support the findings and disregard all evidence and inferences to the contrary. *See Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593 (Tex.1986), *cert. denied,* 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985).

■ "No evidence" points of error must be sustained when the record discloses (1) a complete absence of a vital fact; (2) the court is barred by rules of law on evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Associates, Inc.* 793 S.W.2d 660, 666 n. 9 (Tex.1990); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361, 364–368 (1960).

■ Where there exists any evidence of probative force or nature to support a finding, the "no evidence" point must be overruled and the finding upheld. *In re King's Estate,* 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951). Furthermore, where there is more than a scintilla of the evidence in support of a finding, a "no evidence" challenge must fail. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987).

Six questions were submitted to the jury as follows:

## QUESTION NO. 1

Should DONNA RENÉ CHANCE be removed as sole managing conservator and

GENE RAY CHANCE be appointed sole managing conservator of the children named below?

Answer "Yes" or "No" for each child.
ZACHARY RAYMOND CHANCE YES
MATTHEW LOGAN CHANCE  YES

### QUESTION NO. 2

Has Mother committed acts that are emotionally or physically endangering to the minor child, Zachary Chance?

Answer "yes" or "no".

ANSWER:  YES

### QUESTION 3

Has Father committed acts that are emotionally or physically endangering to the minor child, ZACHARY CHANCE?

Answer "Yes" or "No."

ANSWER:  YES

### QUESTION NO. 4

Has Mother committed acts that are emotionally or physically endangering to the minor child, Matthew Chance?

Answer "yes" or "no".

ANSWER:  YES

### QUESTION 5

Has Father committed acts that are emotionally or physically endangering to the minor child, MATTHEW CHANCE?

Answer "Yes" or "No."

ANSWER:  YES

### QUESTION 6

Was Father's Motion to Modify filed frivolously or designed to harass Mother?

Answer "Yes" or "No."

Answer:  No

We now review only the evidence and reasonable inferences which tend to support the jury's findings, disregarding all evidence and inferences to the contrary.

The judgment of divorce was signed August 26, 1991, wherein appellee Gene Chance, was named Possessory Conservator of the children and awarded certain rights of visitation. Pursuant to the judgment of divorce, Gene Chance was allowed to exercise visitation of the two children on Wednesdays of each week during the regular school term from 6:00 p.m. until 8:00 p.m., beginning on the 28th day of August, 1991. According to the record, on August 28, 1991, when appellee arrived to pick up his two sons, he was met by Mr. Bill Ramsey, stepfather of Donna Chance, who threatened appellee with a shotgun. Appellee states, "I had a shotgun stuck in my stomach and up to my head and was threatened." Evidence reveals: That on August 31, 1991, Gene Chance was at the beach on Labor Day weekend with his two children when Donna Chance and her boyfriend drove by making an obscene gesture at Gene. On September 18, 1991, Donna told Gene that Matthew was ill and would not allow Gene to take him on scheduled visitation. On September 25, 1991, Gene was denied visitation by Donna due to alleged illness of Matthew. On October 6, 1991, Matthew was hospitalized and neither Donna nor her mother, Denise Ramsey, would inform Gene as to which hospital the child was in. On October 18, 1991, Nancy Browning of the Child Protective Services informed Gene that a referral had been made against him regarding sexual abuse of the children. On October 30, 1991, when attempting to pick up the children for scheduled visitation, Mr. Bill Ramsey again threatened to get his gun. On December 26, 1991, Donna informed Gene that the children were sick and denied visitation. In December 1992, Melissa, wife of appellee, was accused of teaching Zachary to stick his finger down his throat and throw up. In January 1992, Donna filed assault charges against Gene to which a jury found Gene not guilty. Frequently, when Gene picked the boys up at night for visitation, all the lights in Donna's house were turned off. Allegations were made against Melissa regarding sexual abuse of Zachary. On February 19, 1992, another referral was made to Child Protective Services alleging that Gene was hitting Matthew. On February 21, 1992, Gene attempted to pick the boys up for visitation; Lumberton police were present, and Donna refused to allow Gene the children. On February 26, 1992, Gene was again denied visita-

tion. Toward the end of February or beginning March 1992, Denise Ramsey, Donna's mother, complained to Child Protective Services that Zachary was witnessing oral sex. During one visitation pick up, Donna gave Melissa honeymoon pictures of Gene and Donna. On March 6, 1992, Gene proceeded to Lumberton to pick up the children for visitation. No one was home; Child Protective Services had already arranged with Gene and Donna to interview Gene with the boys at Gene's home during that weekend visitation. Nancy Browning, Child Protective Services worker, went to Gene's house for an interview, however, the boys were not there. In April 1992, Gene was accused of hitting Matthew in the stomach; these accusations were determined to be unfounded. On April 29, 1992, Gene was accused of burning Zachary on the back. In attempting to exercise court ordered visitation, Gene was accused of trespassing and police were called out. On July 30, 1992, Donna filed an Application for Protective Order just prior to Gene's summer visitation. Donna did not let Gene have the children. She suggested that the court order denied him visitation when in reality the court order required supervised visitation. In September or October 1992, allegations of sexual abuse were made against Gene Chance. On October 27, 1992, Donna filed another Application for Protective Order. On November 18, 1992, Donna requested that criminal charges be filed against Gene for alleged sexual abuse of the boys. In November 1992, Wanda Brumley, specialist with Child Protective Services, asked Judge Plunk to remove the children from Donna. In February 1993, Gene was accused of physically abusing Zachary. Child Protective Services did not validate any sexual abuse. In violation of the judgment of divorce, Donna did not inform Gene of change of address on at least two occasions. The children were taken by Donna to numerous persons for evaluation.

The record before this Court exceeds eighteen hundred pages. The evidentiary portion of this trial took seven days, includes multiple exhibits such as, but not limited to, audio tapes and video tapes, and the testimony of at least eighteen witnesses.

Appellant's contention that there is no evidence to support the submission of Jury Questions 1, 2 and 4 and, further, that there is no evidence to support the jury's response to these three questions, must be overruled. Where there is any evidence of probative force to support the jury's findings, we must overrule a "no evidence" point. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate,* 244 S.W.2d at 661. If there is more than a scintilla of evidence to support the findings, the "no evidence" challenge fails. *Id.* To sustain appellant's "no evidence" points, we would have to conclude that reasonable minds could not differ upon the evidence offered in support of appellee's affirmative burden. The record speaks otherwise.

Having determined from the record that there is more than a scintilla of evidence supportive of the submission of Jury Questions 1, 2 and 4 we now address Paragraph C of appellant's point of error nine, i.e., whether the evidence is insufficient to support the finding of the jury in response to Questions 1, 2 and 4. As previously stated, we give no credence to appellant's great weight and preponderance point of error since appellant Donna Chance did not have the burden of proof in this case. Appellant, by brief, recognizes the following:

In this case, DONNA did not have the burden of proof. When the party who did not have the burden of proof brings a factual sufficiency attack to reverse a finding favoring the party who did have the burden of proof on a preponderance of the evidence, the appealing party must establish that all of the evidence, considering evidence both for and against the fact finding, is so weak or insufficient that the finding is manifestly unjust.

Citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

We overrule Paragraph D of appellant's point of error nine and proceed in considering only the factual insufficiency challenge.

Factually, this lengthy child custody proceeding revealed that appellant and appellee were once husband and wife, and that during this marital relationship two sons were born to this union. Appellant and appellee were

subsequently divorced and appellant was named sole managing conservator of the two minor children. Appellee, Gene Chance, was named as the possessory conservator of these children. Immediately following the divorce, a series of events began to occur which no doubt impacted, and perhaps continues to impact the best interest and welfare of these two innocent children. Evidence showed that immediately after the divorce was finalized, Donna began interfering with Gene's possessory rights of the children. Donna began making allegations of abuse against Gene which, by the time of trial, Donna had come to believe were false. There is evidence of Donna's prompting of these two small children to make false statements about their daddy, Gene. There were few if any occasions when Gene attempted to pick up his children that some type of confrontation did not occur. On the very first visitation period following the divorce, Gene testified that Bill Ramsey, stepfather of appellant, Donna Chance, threatened Gene with a gun by placing the gun to Gene's head and stomach. Gene testified to the following:

Q Now, we've already mentioned that on August 26th, 1991, that was the date that the divorce became final; is that correct?

A Yes, sir.

Q Next date up here is August 28th, 1991. What is the significance of that date?

A On that day, it was the first Wednesday that I went to pick up my children after the divorce. I had a shotgun stuck in my stomach and up to my head and was threatened.

Q You went to pick up the children; is that correct?

A Yes, sir.

Q And was anyone with you when you went to pick up the children?

A Yes, sir, my sister was.

Q And when you went their, [sic] what occurred?

A Well, I went up to the door, knocked on the door and Donna's stepfather came to the door; and I told him that I was there to pick up the children. He slammed the door in my face—

Q Who is Donna's stepfather?

A Bill Ramsey. He shut the door in my face, went to the garage, garage door was right next to it, he grabbed a sawed off shotgun that was in the corner of the garage door and came outside and stuck it in my gut. And he told me that I better kiss my ass good bye because I was a gone mother fucker.

Q Is that a quote from him?

A That's a quote. And he stuck the gun up to my head. And he said he was going to blow my brains all over the fence.

Q Had you done anything other [sic] to come pick up the children?

A No, sir.

Appellant harassed appellee on numerous occasions to prevent court ordered visitation by the appellee.

As for positive improvement, Gene and his wife, Melissa, testified that they would provide a stable home environment for the children because Melissa would be a full-time homemaker and would be able to give her undivided attention to the children and the home. On the other hand, Donna and the children had lived with her mother and her step-father who had threatened Gene with a gun as noted above. Evidence was tendered to inferentially establish that Donna did not keep a clean house. Appellant testified that appellee abused alcohol and drugs. She also testified the children received physical injuries while in his care; that prompted the children to call their mother and grandmother derogatory names, and that Gene harassed appellant. She testified Gene disrupted the exchange of the children with her. She did not press charges against Gene, but in fact Child Protective Services initiated such proceedings. There was conflicting evidence, but the supporting evidence was not so weak that the verdict was clearly wrong and unjust. Enough evidence was presented in detail to the jury to enable the jury to conclude that Gene had met all the statutory requirements necessary to effect a change in

custody and that he was the proper parent to be named sole managing conservator.

■ Appellant contends that the jury finding that Gene had engaged in acts that were emotionally and physically endangering to the children created a conflict in the verdict and required the judgment to be set aside. To set aside the verdict in question, appellant has the burden of showing that the conflicting answer in addition to the remainder of the verdict, disregarding other conflicting answers, requires entry of a judgment totally different from the one entered. *Lewis v. Yaggi*, 584 S.W.2d 487 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.).

Simply because the jury made a finding that both parents had at one time or another committed acts that were emotionally or physically endangering to the children does not conflict with their decision that the retention of the mother as sole managing conservator would be injurious to the welfare of the children and that the appointment of the father as the new sole managing conservator would be a positive improvement for the children. We overrule appellant's point of error nine.

Appellant's point of error one alleges error on the part of the trial court in admitting the testimony of Dr. Gripon, appellee's expert witness. Point of error one is as follows:

The trial court erred in its rulings regarding the testimony of Dr. Gripon, Gene's expert witness, in the following ways:

A. In allowing into evidence the opinions of Dr. Gripon involving the minor children, Zachary and Matthew, for the reason that the children were brought to the psychiatrist, Dr. Gripon, by Gene without the consent of either the court or of Donna, the managing conservator.

B. In allowing consideration of statements allegedly made by Zachary, allegedly recorded on an unauthenticated tape and presented to and considered by Dr. Gripon, because the statements were hearsay and there was no showing before the court and jury that this type of evidence was reasonably relied upon by experts in that field.

C. In allowing Dr. Gripon to testify when Gene failed, upon proper discovery request, to fully inform Donna of that expert's impressions and opinions.

Dr. Gripon was named as an expert witness in appellee's Response to Interrogatories. Appellant misrepresents that Dr. Gripon was "listed as an expert to testify only as to his impressions of GENE CHANCE." Contrary to such representation by appellant, appellee's Answer to Interrogatory No. 8 sets out the subject matter of Dr. Gripon's intended testimony as follows:

psychological and psychiatric testing. Psychological and Psychiatric diagnosis and prognosis of Gene Chance, the minor children, and other family members. The effect of false allegations on the children. What is in the best interest of the children regarding conservatorship and possession.

We find no limitation of Dr. Gripon's intended testimony to that of Gene Chance only. Appellant's misrepresentation of the record prompts this Court to overrule Paragraph C of plaintiff's point of error one.

■ In Paragraph A of appellant's point of error one, appellant takes issue, by play on words, with the fact that Gene Chance took Zachary and Matthew on occasions to Dr. Gripon's office at times of Mr. Chance's appointments. Appellant represents to this Court that, "GENE admits that Zachary and Matthew were taken to see Dr. Gripon in defiance of the decree of divorce, wherein GENE was denied the right to take the children to a doctor for any reason except an emergency." In support of this contention, appellant references certain testimony as follows:

Q Did—when Mr. Smith sent you to Dr. Gripon, it was for the purpose of providing a defense for you in a criminal case, wasn't it?

A No, sir, I went to Dr. Gripon because of all the turmoil and anxiety that I was getting from what they were dishing out to me.

Q You went to Dr. Gripon because of turmoil and anxiety; is that correct?

A Yes, sir.

Q Any other reason?

A No, sir.

Q Did you go to Dr. Gripon to have him examine your children to determine if they needed help?

A I had brought my children to Dr. Gripon on one occasion when I had them— well, must have been two or three occasions while they were in my possession.

Q Did you bring your children to Dr. Gripon with the court order?

A No, sir.

Q You brought your children to Dr. Gripon after you had a lawyer for several years in direct violation of the court order that was entered by Judge Farris, didn't you?

A That's false.

Mr. Matheny: May I approach the witness, your honor?

The Court: Yes.

Q (By Mr. Matheny) This has been previously introduced into evidence, but not photostated, and you were appointed as possessory conservator of these children; weren't you, Mr. Chance?

A That's correct.

Q Did your lawyer instruct you to take these children to Dr. Gripon without a court order?

Mr. Smith: Your Honor, I'm going to object. That's falls into attorney-client privilege.

The Court: Objection will be sustained.

Q (By Mr. Matheny) The duties of a possessory conservator, sir, where does it say you have the right to take them to any doctor, except for an emergency medical treatment?

A I have the right to have the possession of my children anywhere I went, whether it be the supermarket, whether it be the psychiatrist, whether it be on vacation.

The Court: Now, Mr. Chance, please answer the questions.

A I have the power to consent to medical and surgical treatment during emergency involving an immediate danger to the health and safety of the children during periods of possession.

Q (Mr. Matheny) You were not granted the right to take these children to a doctor for anything except an emergency, were you?

A Emergency, yeah, I guess so.

Q But you took it upon yourself to take them to a psychiatrist without a court order, without permission of the managing conservator, just—did you do that on your own, or were you instructed to do it?

A The children didn't see the psychiatrist.

Dr. Gripon testified that he did, indeed, see the children at his office when they were brought by Gene on the occasions, however the children were not patients of Dr. Gripon. In fact, Dr. Gripon testified that he never talked with Zachary or Matthew. Dr. Gripon neither examined nor questioned the children for purposes of rendering a medical opinion regarding the childrens' mental health. We believe that appellant's portrayal of the children being taken to Dr. Gripon's office in violation of court order is overreaching. The fact that Gene Chance had the children accompany him to scheduled appointments at Dr. Gripon's office certainly does not establish or prove that the minor children were patients of Dr. Gripon. Dr. Gripon testified under oath that the boys were not his patients. Appellant cites the case of *Day & Zimmermann, Inc. v. Strickland,* 483 S.W.2d 541 (Tex.Civ.App.—Texarkana 1972, writ ref'd n.r.e.), for the proposition that "[o]ne should not be allowed to play fast and loose with the rules of procedure, much less be rewarded." We agree with appellant's general statement about "fast and loose" play, and this Court applies that same general philosophy to the use of the record on appeal. *Strickland* involved a trespass upon plaintiff's property whereby an unlawful inspection occurred. We do not find our present situation comparatively similar to *Strickland.* Even had Gene Chance taken the two minor children to Dr. Gripon for observation, we are hard-put to find a direct violation of the original Divorce Decree with provides:

**IT IS ORDERED AND DECREED** that Possessory Conservator shall have the follow rights, privileges, duties, and powers:

\* \* \* \* \* \*

the power to consent to medical and surgical treatment during an emergency involving an immediate danger to the health and safety of the children during periods of possession;

\* \* \* \* \* \*

The decision to incur health care expenses shall be made by DONNA RENÉ CHANCE except when the children are visiting with GENE RAY CHANCE said decision shall be made by GENE RAY CHANCE.

Regarding Dr. Gripon's opinion concerning Zachary and Matthew, the doctor testified that he saw the children at his office when Gene brought them on the occasion of one of Gene's appointments. The children were not patients of Dr. Gripon and in fact, he never talked with Zachary or Matthew. He did not examine the children for purposes of rendering a medical opinion regarding the children's mental health. Hence, there was no violation of any order forbidding appellee from taking his sons to a doctor except in emergency situations.

Appellee had submitted himself to treatment by Dr. Gripon because of appellant's repeated allegations against him of sexual and physical abuse of the children and the extreme difficulties in appellant's exercising his visitation rights with the children. The doctor specifically testified that the children were not his patients. We also note that the trial court never adjudicated Gene to be in violation of the judgment of divorce concerning this area.

We find no valid reason to disregard Dr. Gripon's testimony for alleged violations of the judgment of divorce. Paragraph A of appellant's point of error one is overruled.

■ Appellant contends that it was error to allow Dr. Gripon to base his opinion, at least on part, on statements contained in a tape-recording of Zachary Chance. This tape-recording was made by Gene Chance of a conversation between himself and his son,

Zachary. This taperecording was used by Dr. Gripon as part of the history and background information concerning Gene Chance and the problems which Gene was experiencing. Gene Chance supplied Dr. Gripon with the tape-recording along with records from Dr. Lane, who had been treating Zachary and Matthew on a referral from Child Protective Services. This information constituted part of the history taken and evaluated by Dr. Gripon, analyzed by him, at least in part, to form the basis of an opinion.

■ For an expert's opinion to be admissible as evidence, the witness must be qualified in the area of his opinion, his opinion must have a sufficient evidentiary foundation, and the opinion must assist the fact finder. *See* TEX.R.CIV.EVID. 702–705. There is no contest that Dr. Gripon qualified as an expert in the field of psychiatry. For the evidentiary base, Dr. Gripon relied on appellee's history, which included Dr. Gripon's interview of appellee, another doctor's records, the tape recording in question, interviews with appellee during his office visits, tests, evaluations, and treatment. As an expert, Dr. Gripon could base his opinion at least in part on inadmissible opinions if the facts are of a nature that other experts in the field reasonably rely on same. Even if the tape of the conversation with Zachary is inadmissible Dr. Gripon's opinion would remain admissible. Admissibility is, of course, determined by the sound discretion of the trial court. *Trick v. Trick,* 587 S.W.2d 771 (Tex.Civ. App.—El Paso 1979, writ dism'd). We overrule appellant's point of error one in its entirety.

■ Appellant alleges in her point of error two that the trial court erred in refusing to allow appellant to question one Cheryl Schultz regarding her statements to another witness and by refusing to allow appellant the right to make a bill of exceptions regarding that particular testimony. While the trial court refused appellant the opportunity to make a bill of exceptions on the excluded testimony in question and answer form, appellant was allowed to make an offer of proof which apprised the court of the substance of the testimony which adequately preserved appellant's contention for appeal. The offer

of proof was in the form of a concise statement which is allowed under Tex.R.App.P. 52(b) and Tex.R.Civ.Evid. 103.

> Mr. Matheny: I would ask the witness if she told the witness, Wanda Brumley, that she should not be talking to me, Mike Matheny, one of the attorneys for Donna Chance, because she was supposed to be a witness for the other side, the other side of Gene Chance. And that she instructed her not to talk with me. I'd ask had her whether she said something along that line.
>
> I would further ask her what exactly she said. I would further ask her was that not an incorrect statement of the law. And that since she was a trial lawyer, why did she make an incorrect statement of law to Wanda Brumley. And that would be the question, Judge, and that's all I have.

The line of questioning by Mr. Matheny was as follows:

> Q. Yes, Ma'am and that is in—that is incorrect, isn't it? You told her something that was in direct violation of the code of professional responsibility?
>
> Mr. Smith: I'm going to object. That has absolutely no relevance to this proceeding.
>
> The Court: All right. I don't believe that's the tribunal for this, Mr. Matheny. There are other tribunals to hear those kind of matters.
>
> . . . .
>
> The Court: I don't believe she's here in the capacity of an attorney. All right.

■ Appellant must show that the excluded testimony was relevant and a substantial right was affected and further, the substance of the evidence was made known to the court by offer of proof, the third requirement satisfied in the case before us. *See Hood v. Hays County,* 836 S.W.2d 327 (Tex.App.—Austin 1992, no writ). We fail to see any error in the exclusion of the proffered evidence because appellant never demonstrated that the testimony was relevant or that it affected a substantial right in the case. In any event, the rule requiring that proffered evidence be incorporated in a bill of exception does not apply to cross examina-

tion of an adverse witness. *Ledisco Financial Services, Inc. v. Viracola,* 533 S.W.2d 951 (Tex.Civ.App.—Texarkana 1976, no writ). When cross-examination testimony is excluded, appellant need not show the answer to be expected but only need show that the substance of the evidence was apparent from the context within which the question was asked. *Life Ins. Co. of Southwest v. Brister,* 722 S.W.2d 764 (Tex.App.—Fort Worth 1986, no writ). Thus, the trial court did not prevent appellant from preserving a record for review. We find that any error committed by the trial court was harmless because the testimony in question was not relevant to any material issue in the case other than bias, which was already established through other evidence. *4M Linen & Uniform v. W.P. Ballard & Co.,* 793 S.W.2d 320 (Tex.App.—Houston [1st Dist.] 1990, writ denied). In summary, it is rare that reversible error will occur in questions of evidence unless the complaining party can demonstrate that the entire case turns on the particular evidence admitted or excluded. *Service Lloyds Ins. Co. v. Martin,* 855 S.W.2d 816 (Tex.App.—Dallas 1993, no writ). We overrule appellant's point of error two.

■ Appellant alleges, regarding the witness Frank Stubbs, the court erred in refusing to allow samples of the handwriting of appellee into evidence and allegedly commenting on the weight of the evidence during the testimony of Frank Stubbs. Appellant called Frank Stubbs as a handwriting expert to establish that Gene had written certain messages in public places. He concluded that appellee had in fact written the messages on the walls. As a basis for his handwriting, Mr. Stubbs examined certain writings by the appellee including checks, an anniversary card, a deposit slip, a tax return, a signed contract, an affidavit, and a deed of trust executed by appellee. Appellee took the position that Stubbs had only examined used checks in making his overall comparison and no other documents. The court sustained the predicate objection by appellee to the introduction of those items. The witness equivocated in testifying about his evidentiary foundation for his opinion. On voir dire, he changed some of his testimony, and in

fact, stated that he did not remember whether he actually used the deposit slip as a comparison after all. His memory was unsure and his testimony was contradictory. Trustworthiness was not established by appellant and the witness could not testify that he used all of the documents contained in the singular Exhibit No. 18 for his comparison, therefore the singular exhibit containing all the materials should not have been admitted.

Appellant further objects to remarks made by the trial judge concerning the photographs of the walls, telephone booths, and portable bathrooms on which there were certain writings. In ruling on admissibility of the pictures, the trial judge commented "I think he's testifying as a photographer. They'll be admitted as a photograph. He goes around taking pictures of dirty words." When appellant's attorney asked to introduce the pictures to the jury, the judge responded "If they want to look at them. I don't recommend them, particularly you ladies." Appellant urges that the comments made by the court were in fact a comment on the weight of the evidence. While the trial court should not disclose an opinion as to the weight of the evidence or calculate to increase or diminish the weight of the evidence to the jury, the trial judge is not limited to expressions "objection sustained" or "objection overruled". A trial judge is allowed some discretion in expressing himself in the control of a case and reversal should not be ordered unless there is a showing of impropriety coupled with probable prejudice. *Best Investment Company v. Hernandez,* 479 S.W.2d 759 (Tex.Civ. App.—Dallas 1972, writ ref'd n.r.e.); *Trinity Universal Ins. Co. v. Jolly,* 307 S.W.2d 843 (Tex.Civ.App.—Austin 1957, writ ref'd n.r.e.). We find that the comments made by the trial court were not so prejudicial in view of the entire record that they could possibly constitute reversible error. TEX.R.APP.P. 81(b)(1). We therefore overrule appellant's point of error number three.

In point of error four appellant argues that the trial court made certain remarks to appellant's counsel during the course of the trial that were prejudicial to both appellant's case and to her attorney. These comments are as follows:

Mr. Matheny: Judge, my objection is they've introduced a tape. The tape speaks for itself. I'd like to have it duplicated and let the jury listen to it.

The Court: The jury is going to listen to it, all of it.

Mr. Matheny: But then he is now attempting to say what was said on the tape.

The Court: I don't think he's doing anymore than you did while ago.

Mr. Matheny: That may be, but you wouldn't let me.

The Court: I've ruled. You may have a seat.

Mr. Matheny: May I make—

The Court: Sit down.

Mr. Matheny: May I make an objection while I'm sitting down?

The Court: Stand up and make your objection, however nice you want to be.

Mr. Matheny: I'm just trying to follow the rules.

The Court: You're following the rules. Make your objection.

Appellant also alleges that the trial court in responding to a request to be heard by appellant's counsel that "We could have done all this in recess" led the jury to conclude that the appellant's attorney was wasting their time and the court's time. Perhaps the jury was given the impression that the trial judge was impatient and therefore somewhat agitated by the manner in which appellant's counsel was conducting his case. The record reflects that counsel was not inexperienced and that he possibly invited and contributed to the court's growing concern over the conduct of the trial. We do not find evidence that the trial court entertained or displayed any bias or prejudice against appellant and her counsel but that the remarks were directed toward the orderly process of the trial. *French v. Brodsky,* 521 S.W.2d 670 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.), *overruled on other grounds by Texarkana Memorial Hospital, Inc. v. Jones,* 551 S.W.2d 33 (Tex.1977). We cannot find reversible error based on the record. TEX.

R..App.P. 81(b)(1). We therefore overrule appellant's point of error four.

In point of error five appellant alleges error on the part of the trial court in allowing one Dr. Bender to testify as to his impressions and opinions when appellee had not fully informed appellant upon proper discovery request of the expert's impressions and opinions. Appellant alleges that the trial court erred in allowing the doctor to testify based upon hearsay that he received from appellee. The interrogatory in question reads as follows:

8. If you intend to call any expert or experts as witnesses with regard to the subject matter in issue in this cause of action, then—

   a. identify each such expert;

   b. state the subject matter on which each such expert is expected to testify, including the expert's impressions and opinions;

   c. state the facts known to each such expert that relate to or form the basis of the mental impressions and opinions held by the expert; and

   d. identify all documents, communications, and other tangible things used by, prepared by, prepared for, or furnished an expert in anticipation of the expert's trial or deposition testimony, including all tests and calculations that form the basis of the expert's opinion.

Appellee's response to interrogatory number 8, at least in regard to Dr. Bender, is as follows:

   a. William Bender, Ph.D.
      1250 Overlook Ridge
      Bishop, GA
      (706) 769–7893

   b. Research on false allegations of abuse

   c. those facts related to the expert by the parties and the children

   d. only those documents in possession of the expert

Based on this answer, the subject matter of Dr. Bender's testimony would include research on false allegations of abuse and in conjunction therewith "[t]hose facts related to the expert by the parties and the chil-

dren." The question and response taken together specifically relate that the facts given the expert by the parties and the children would form the basis of his opinion. In examining the record, we find that appellee properly answered the question and the courtroom inquiries to Dr. Bender fit within the answer to the subject interrogatory. Tex.R.Civ.P. 166b(2)(e). Appellant further contends that Dr. Bender's opinion was based on hearsay from appellee. Dr. Bender also testified that his opinion was not only based on his meeting with Gene Chance, but his review of research articles, Child Protective Services reports, appellant's application for protective order, and a structured interview with a series of follow-up discussions with appellee. We find this evidentiary base to be sufficiently reliable and a reasonable foundation to be relied upon by an expert in this field. We find that the trial court in this case did not abuse its discretion in allowing the testimony of Dr. Bender based upon this evidentiary foundation. We overrule appellant's point of error five.

Appellant in her point of error six alleges error on the part of the trial court in admitting into evidence the audio tape made by appellee in the office of Dr. Frank Lane. The tape recording in question was made by appellee of Dr. Lane's meeting with himself, Melissa Chance, and Cheryl Chance on March 10, 1992. Appellant presented her witness, Dr. Frank Lane, whose testimony was based at least in part on a tape recording which Donna Chance, appellant, had secretly made of appellee and Zachary Chance. Dr. Lane's testimony was also based on written notes and records of Debra Eisen, an employee of Dr. Lane.

On direct examination, Dr. Lane testified that appellee was attempting to program the child, Zachary, and such conduct was emotionally abusive to the child. He further testified that the notes of Debra Eisen did not reflect that appellant was programming the children, rather the notes indicated one Stewart Umlauf was of that persuasion. Dr. Lane stated on direct examination that in light of the children being used as pawns,

removal from their mother would have a very negative effect.

On cross-examination Dr. Lane, in being examined about the March 10, 1992, meeting and his recollections of it, made at least sixteen denials about specific statements made by himself at that meeting. Dr. Lane was given an opportunity to refresh his memory by listening to the tape. The tape was entered into evidence. Appellee was well within his rights to have the tape admitted and played for rebuttal and impeachment purposes. *Ramsey v. Lucky Stores, Inc.*, 853 S.W.2d 623 (Tex.App.—Houston [1st Dist.] 1993, writ denied). We therefore overrule appellant's point of error six.

■ Appellant complains in her seventh point of error that the trial court should not have overruled appellant's objections to certain hearsay statements by Zachary Chance and by overruling appellant's request and motion to disregard such hearsay evidence. Appellant complains that certain statements by Zachary relayed by appellee constituted hearsay evidence and was inadmissible. Appellee testified that Zachary had stated "Daddy hits Matthew" and Zachary may have said something about Melissa sexually abusing him. Appellee further stated that when he noticed scrapes on Zachary's back and asked him what happened he stated "He told me that Daddy put him in the fire. And I said well, who told you that or who said that, and he said Mimaw said that or say that. [Question:] Mimaw is—. [Answer:] Donna's mother." It was further relayed by Appellee that, "Zachary was saying that Daddy puts his tee-tee in my mouth. That's the main thing that I remember. Zachary saying things or having some kind of sexual knowledge above what he should have." Appellant alleges that these statements implicate appellant in a type of attempt to program the children, this programming being a major part of appellee's case. Whereas appellant contends that the entirety of appellee's case was built on this hearsay, we find otherwise. These statements were not offered to prove the truth of the matter asserted but were offered under the exception to the hearsay rule providing that the testimony related to the mental and emotional condition of the child. Tex.R.Civ.Evid. 803(1),(3). The child, Zachary, was of a tender age being only two or three years old and revealed the child's state of mind and lack of emotional well being. *Posner v. Dallas County Child Welfare*, 784 S.W.2d 585 (Tex.App.—Eastland 1990, writ denied). We overrule appellant's point of error seven.

■ Appellant's point of error eight alleges charge error on the part of the trial court in refusing to give certain instructions requested by appellant and by giving a certain instruction regarding the statements of the child, Zachary. The court charged the jury by instruction that they were to disregard all evidence of any statements said to have been made by Zachary to any person except (1) any statements made personally by him to any mental health care workers, or (2) statements allegedly made by him that the jury finds were considered by mental health workers. Counsel for appellant objected to this instruction on grounds that it amounted to a comment on the weight of the evidence. Appellant tendered an instruction telling the jury to disregard all evidence of any statement made by Zachary to any person except statements made personally by him to any mental health care workers. We have previously discussed the issue of the court's having admitted statements by Zachary under certain exceptions to the hearsay rule. *See* Tex.R.Civ.Evid. 803(1),(3). We find that the court sufficiently narrowed the consideration of the evidence to those statements he made personally or statements made by him which were considered by health care workers. We find this instruction to be substantially correct and does not constitute a comment on the weight of the evidence.

Appellant's requested instructions one through seven read as follows:

You are instructed to disregard all evidence of any statements said to have been made by the child, Zachary Chance, to any person, except any statements made personally by him to any mental health care workers.

You are instructed to disregard any statements made by Gene Chance, Melissa Chance, or Cheryl Chance contained in the

(secret) tape made in Dr. Lane's office regarding any purported statements of the child, Zachary Chance, or any other third person.

You are instructed to disregard any statements of the child, Zachary Chance, made to his mother, Donna Chance, as to the truth and veracity of those statements, but you may consider these statements for whatever effect, if any, they had upon the motives of Donna Chance.

You are instructed to disregard any statements said to have been made by the child, Zachary Chance, to Melissa Chance, Gene Chance, or any other person other than any personal statements made by Zachary Chance to any mental health care worker.

You are instructed to disregard any statements of Gene Chance regarding any statement said to have been made to him by Nancy Browning.

You are instructed to disregard any statements said to have been made by the child, Zachary Chance, to Cheryl Shultz.

You are instructed to disregard any opinion of Dr. Gripon relating to his observation regarding the taped statements of the child, Zachary Chance.

At the outset, we note that trial courts have wide discretion in admitting instructions and definitions to the jury. *Lone Star Ford, Inc. v. McCormick*, 838 S.W.2d 734 (Tex.App.—Houston [1st Dist.] 1992, writ denied). We note that appellant's requested instructions one, three, four, six, and seven are actually phases and shades of the instruction given to the jury by the court. We find no error in refusing these requested instructions. *Braugh v. Phillips*, 557 S.W.2d 155 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

Regarding appellant's second and fifth requests, Gene Chance and Melissa Chance each testified at trial. Cheryl Chance was available as a witness who could have been examined. Appellant had adequate opportunity to establish grounds for disregarding the statements complained of by appellant. We also note that Nancy Browning testified at trial. We find that the charge questions and instructions are an accurate reflection of the rulings made by the court during trial re-

garding admissibility of statements objected to as being hearsay. We find that appellant has failed to show the trial court's refusal to submit to the jury the requested instructions as well as the trial court's refusal to sustain her objection to the inclusion of an instruction regarding Zachary's statements to be reasonably calculated to cause and probably did cause rendition of an improper verdict. *Multi–Moto Corp. v. ITT Commercial Finance Corp.*, 806 S.W.2d 560 (Tex.App.— Dallas 1990, writ denied). We therefore overrule appellant's point of error eight.

Point of error ten alleges that the cumulative effect of all the errors in her trial supports a reversal of this cause. Appellant sets out fourteen allegations of error specifically setting out alleged error discussed under appellant's points of error. We have discussed each of the fourteen points in the various points of error. We have considered all allegations of error committed on the part of the trial court and we specifically find that any possible error committed by the trial court does not constitute cumulative error and we therefore overrule appellant's tenth point of error. *See Rhodes v. Batilla*, 848 S.W.2d 833 (Tex.App.—Houston [14th Dist.] 1993, writ denied).

Point of error eleven complains part of Exhibit No. 18 is missing from the appellate record. Appellant's motion to supplement the statement of facts was granted and the entire exhibit now appears in the record. Point of error eleven is overruled as moot.

Having overruled all of appellant's points of error, we affirm the judgment of the trial court below.

AFFIRMED.

JACK BROOKSHIRE, Justice, Assigned, dissenting.

My dissent filed July 20, 1995 is withdrawn. This dissent is a substituted therefor.

The appeal, sub judice, stems from a proceeding for the modification of custody of two very young boys, Zachary and Matthew, involving the managing conservatorship of Donna René Chance. The two boys are the

sons of Donna René Chance and Gene Ray Chance. Zachary was born in mid-August of 1989, and Matthew was born in late January 1991. The divorce was granted August 26, 1991.

Gene sought the modification less than a year after the divorce decree was signed. He proceeded to a trial on the merits on his Amended Motion to Modify a suit affecting the parent-child relationship. Gene's amended motion was filed August 10, 1992. He filed a supplemental motion to modify April 12, 1993. Donna went to trial on her Amended General Denial Answer filed in April of 1993. A juried proceeding followed. Actually, a jury was selected on April 5, 1993, and certain pre-trial motions were heard seven days later. The trial pleadings were changed or modified after the selection of the jury. The jury trial did not commence until May 3, 1993, one month after the jury had been selected.

The evidence was taken before the jury for a number of days and on May 12, 1993, the court submitted the charge to the jury. The jury reached a verdict. The verdict in answer to one of the questions named Gene as the sole managing conservator of the two young boys.

Before the entry of the judgment in the case, Donna filed her Motion to Disregard Findings on Questions and also a Motion for a Judgment Non Obstante Veredicto. In addition, Donna filed a motion for a mistrial. Donna's motions were not granted.

An order dealing with the amended motion to modify a suit affecting the parent-child relationship was signed on June 15, 1993, appointing Gene the sole managing conservator of Zachary and Matthew. Donna timely filed her motion for new trial and an alternative motion styled a Motion to Vacate, Correct, Modify, or Reform the Judgment. The post-judgment motions of Donna were denied; this appeal was timely taken and perfected. The briefs of both appellant and appellee agree to the above procedural history and procedural posture of the parties.

Donna prays for the judgment or order of the court below to be reversed and that she be returned to her pre-trial status as the managing conservator of the young boys or that the entire cause be remanded for a new trial asking, in addition, for further relief and equitable relief.

The jury in its findings decided that Donna should be removed as sole managing conservator and Gene should be appointed as the sole managing conservator of both of the children, Zachary and Matthew. However, the jury also found that Gene had committed acts that were and are emotionally or physically endangering to both of the young boys.

Donna presents, argues, and briefs eleven points of error each of which was countered by a corresponding reply point in appellee's brief. It must be considered that Donna had been appointed as the sole managing conservator of these children under the decree of divorce which was signed in August 1991.

The protagonists acknowledged that Tex. Fam.Code Ann. § 14.08(c)(1) (Vernon Supp. 1995) is of paramount relevance in deciding this litigation. Therefore, Gene, the movant, was required to prove:

(A) the circumstances of the child, sole managing conservator, possessory conservator, or other party affected by the order or decree have materially and substantially changed since the date of rendition of the order or decree to be modified; *and*

(B) the retention of the present sole managing conservator would be injurious to the welfare of the child; *and*

(C) the appointment of the new sole managing conservator would be *a positive improvement for the child.*

In view of the plain language of section 14.08(c)(1) Gene had the burden to prove that retaining Donna as the sole managing conservator would be injurious to the welfare of the children and that Gene, as the managing conservator would be a positive improvement. Donna challenges the verdict by proper points of error claiming "legal insufficiency," "factual insufficiency" and that the verdict is against the great weight and preponderance of the evidence. Thus, the entire record must be reviewed and analyzed. This review and analysis is mandated by the several points of error amply briefed by appellant. The record is lengthy and includes a

large number of exhibits with audio and video tapes.

At the close of the evidence presented by Gene, Donna presented a motion for an instructed verdict. The motion for instructed verdict was based upon several grounds and was argued at some length. After both counsel had presented their arguments concerning Donna's motion for instructed verdict, the court outside of the presence of the jury made this very significant recital:

The Court: Let me just bring this up now. I haven't heard from Mrs. Chance. But everything that I've heard is addressed to Mimaw. Now, I addressed that back in my December hearings, and I said henceforth these children will never be picked up at the residence of Mrs. Ramsey, and Mrs. Chance with some reluctance disclosed where she lives. That has been removed. Now, Mimaw is the one that has been referred. Now, I've heard very little of Mrs. Chance, the mother has done anything.

The trial bench further observed that:

The Court: You have a suit pending here against Mrs. Ramsey, and that is still pending, as far as I'm concerned, for emotional infliction and various interference with matters. But now, let's talk about what has this lady done that is injurious?

Mrs. Ramsey is the mother of Donna and the former mother-in-law of Gene. Mrs. Ramsey is known also as Mimaw. To defeat the motion for instructed verdict, counsel for Gene argued and relied upon the testimony of Dr. Gripon and also that there had been statements made by the children that stated in substance Mommy says Daddy does this and Daddy does that as well as what Mimaw says and does.

It was clear that the alleged statements made by the children were hearsay under this record even as to a mental health worker. And even though the mental health worker who states that he or she was told of the hearsay statements of the children may give weight to them in the mental health care worker's decisions, the resulting double hearsay is not admissible before the jury—nor is it a basis for an opinion by a non-treating psychiatrist. The alleged taped statements of the children were made totally outside the courtroom and not subject to any sort of truth seeking cross-examination; they cannot be accepted as factual evidence. Plainly, the relied-upon statements of the young boys (relied upon by Gene) were made outside the presence of the mental health worker.

At the end of the argument on Donna's motion for instructed verdict, the trial bench announced in substance that he was going to wait until after hearing from Mrs. Chance to see apparently if the court's instructions following the December hearing had been of any effect or validity. The court stated to Donna's counsel, "... I'm very persuaded with what you have to say, and I'll keep that in mind."

Inasmuch as the trial bench asked Gene's attorney to speak in rebuttal on Donna's motion for instructed verdict, Gene's counsel did so. Gene's counsel summarized his case and his evidence of harm and said that it was based on the proposition that Donna had prompted her children to say unkind things against Gene. The "harm" was based upon allegations of taped utterances of Zach which were not established by direct proof or evidence—not even by admissible evidence. Inadmissible hearsay and double hearsay formed the basis of the "harm." The hearsay and double hearsay were the result of a tape made and controlled by Gene. This out-of-court inadmissible tape was the so-called fact basis for an opinion or testimony of a psychiatrist. No correct evidentiary base existed for these "expert opinions."

Usually when the children went to see their father, the children were accompanied by a diaper bag and in the bottom of the diaper bag on November 1, 1991, there existed a voice activated tape recorder and the proffered parts were certain excerpts from the conversation between Gene and his children. The tapes offered as Respondent's Exhibit No. 2 and Respondent's Exhibit No. 6, were played to the jury. Donna's tapes were not based on double hearsay. Donna's tapes contained admissions and admissions against interest by Gene. These admissions against Gene are set out in the unpublished part of this dissent. (First part.)

Appellant's point of error one, summarized, charges that the trial bench erred in its ruling regarding the testimony of Dr. Gripon, Gene's expert witness, in three principal ways: (1) in allowing into evidence the opinions of Dr. Gripon involving the minor children Zachary and Matthew for the reason that the children were brought to the psychiatrist, Dr. Gripon, by Gene without the consent of either the court or Donna, the managing conservator; (2) in allowing consideration of the statements allegedly made by Zachary allegedly recorded in an unauthenticated and unproduced tape and presented and considered by Dr. Gripon because the statements were hearsay and there was no showing before the court and the jury that this type of evidence was reasonably relied upon by experts in that field and; (3) in allowing Dr. Gripon to testify when Gene failed upon proper discovery requests to inform Donna of that expert's impressions and opinions.

Dr. Edward B. Gripon, a psychiatrist, was the second witness called by Gene and undoubtedly was a very influential witness before the fact finders. Dr. Gripon's first professional visit with Gene took place in February of 1992, about 16 months before the trial under review in this appeal. While conducting his interview and office visit *with Gene,* Dr. Gripon observed the children who were in the company of Gene. The children's being in Dr. Gripon's office was in clear violation of a valid court order. Nevertheless, the psychiatrist was permitted to give his opinion and his views based upon his observations. His opinions, views, and testimony had their basis also in impermissible hearsay. Indeed, double hearsay.

The record reflects that the doctor was testifying in his role as a professional medical doctor, expert in the field of psychiatry. But his testimony was not based on professional, psychiatric interviews or treatments or psychiatric diagnosis of Zach or Matthew.

Significant and important is that Gene's case was based on allegations that Donna and the maternal grandmother, Mimaw, were interfering and hindering his relationship with Zach and Matthew and that Donna was making false, harmful reports alleging that Gene was, in several ways, abusing the little boys *and* also that Donna was programming the very small boys against their Dad and his kinfolks.

Under the record, no direct evidence of probative value exists against Donna. No real probative circumstantial evidence is presented against her. However, by piling inference upon inference and circumstances upon circumstances, including double hearsay and hearsay within other hearsay, no more than a mere, spurious scintilla of evidence is shown adverse to Donna.

Evidence of probative worth is lacking to even tend to show that the conduct of Donna, the mother, was injurious to her own boys.

In sum, Donna vehemently argues that Gene failed to discharge his burden of proof.

With candor, Gene admits that Zachary and Matthew were taken into the office of Dr. Gripon to be seen by Dr. Gripon in violation of a valid court order. Under the divorce court's final decree, Gene did not have the right to take the children to a doctor for any reason except in an emergency. However, Gene's explanation is that he personally went to see Dr. Gripon seeking Gripon's expert psychiatric evaluation and treatment (of himself) after his own lawyer had sent him to see Dr. Gripon because of his, Gene's, own anxiety and turmoil.

Thus, Gene takes the position that although Dr. Gripon never examined the children, never talked to them, and never treated them; nevertheless, Dr. Gripon did look at the boys and thus Dr. Gripon is qualified to testify and give opinions.

Gene's actions, apparently pre-planned, took place after Gene had actually filed a motion to have the children examined by a psychiatrist of Gene's choice. But such motion was never presented or urged upon the trial court. Dr. Gripon affirms that he saw the children in his office in Beaumont and that there was no medical emergency involving the children at the time that he, Gripon, saw the children—and there was no emergency as to Gene.

Gripon also acknowledged that he had no permission from the managing conservator to see the children. This doctor states that the

children were not patients of his own. Gene agrees that the children were not patients of Dr. Gripon. Although proper and timely objections were made to the testimony of Dr. Gripon by Donna's attorney at trial, the objections were overruled. Dr. Gripon did not merely see the children or observe the children in aid of Gripon's treatment of Gene's problems. The great thrust of Dr. Gripon's testimony was proffered to the jury as his being a psychiatric expert to provide opinions regarding the proper custody of the children and who should be the managing conservator.

Dr. Gripon was a very impressive witness for the jury. He had completed a rotating internship in the United States Air Force in various hospitals, one of which was located in San Antonio. He had attended flight school and spent two and a half years as a flight sergeant in the United States Air Force. After Dr. Gripon left the Air Force in 1972, having attained the rank of major, he returned to the University of Texas Medical Branch at Galveston and completed a psychiatric residency program by 1975. At that time, Dr. Gripon was the Chief Resident of the Department of Psychiatry.

His testimony revealed that he had qualified and testified as an expert in the field of psychiatry many times. He had testified as an expert psychiatrist in behalf of the State of Texas. He had been a witness also as an expert psychiatrist for the local District Attorney's Office. He had done assessments for the federal system and had done contract work for both the juvenile and adult probation departments in Jefferson County.

Additionally, he had performed numerous evaluations of sanity and incompetency matters in criminal proceedings. In his practice, the doctor testified that he became involved in numerous situations involving family law matters and problems of family relationships and parent-child relationships.

The psychiatrist testified that in his practice he had experience in dealing with people sexually abusing children. He stated that there were a number of different kinds or types of sexual abuse. Some persons he classified as Pedophiles. Those were classified as individuals who sexually abuse a pre-pubescent or a minor child usually of the same sex. He identified and defined certain individuals as victims of Paraphilia. Paraphilia is a sexual disorder of an individual. Sometimes the abuse is simple physical abuse. This psychiatrist found no evidence of Pedophiles or Paraphiliacs in this case. The doctor's qualifications did not cause any problems. Rather it is the tape of Zach furnished to him that creates error. But this tape was never produced in discovery or at trial by Gene. The doctor cannot be expected to be a legal expert in the field of evidence.

Donna's trial counsel was obliged to conduct his voir dire of Dr. Gripon in the presence of the jury. Dr. Gripon stated upon questioning at voir dire:

### VOIR DIRE

By Mr. Matheny:

Q   Dr. Gripon, did you personally ever see these children?

A   I've seen the children, yes, sir, at the office.

Q   In your office in Beaumont, Texas?

A   Yes, sir.

Q   Was there any type of medical emergency involving these children at the time you saw them?

A   No, sir.

Q   Did you get permission from the managing conservator to see these children?

A   No, sir.

A summation of Dr. Gripon's own testimony is as follows: "I (Dr. Gripon) don't consider it a medical emergency in that sense, no." Indeed, Dr. Gripon reiterated that the children were not patients of his. The doctor testified that it was very easy for a parent to program a child to say certain things if the child is at the age of one or two or slightly older and children at that age have a strong tendency to merely parrot and to repeat back whatever someone endeavored to teach that child. The doctor stated, "They tend to regurgitate or state that back." "Also children before the age of four to five cannot abstract. Therefore, they can't tell whether what you

are telling them is true or not. They have nothing to really test it by."

It is glaringly clear that Dr. Gripon never had the children as patients and did not treat them or consult with them or have a professional psychiatric interview or evaluation of them. Nevertheless, he gave expert opinion evidence as an expert psychiatrist in violation of the divorce court's orders. Donna's attorney had a full running objection to Dr. Gripon's evidence. The error was preserved.

Unquestionably the testimony of Dr. Gripon was employed to attempt to provide expert psychiatric opinions regarding the custody and welfare of these children as well as the merits of who should have the sole managerial conservatorship of the children. His evidence was used to damage and denigrate Donna's conservatorship. Plainly, the crucial portion of Dr. Gripon's testimony (as to the boys) was clearly based on hearsay contained in a tape of Zach. The tape was never authenticated or produced and was based on double hearsay.

A party litigant, especially in a child custody proceeding, should not be rewarded for defying court orders and for thwarting and defeating the rules of legitimate discovery. Plainly, Dr. Gripon's testimony was admitted through error for several reasons: first it was obtained in defiance of a court order and of a final decree of the divorce court. It was also obtained without permission of the divorce court or the managing conservator. It was also obtained without permission of the divorce court or the managing conservator. It was also based on hearsay of very young children.

Had Gene presented his motion to have his children examined by a psychiatrist of his own choice, the probabilities were that the said motion would have been granted. Gene should have followed proper discovery procedures. Following contrary procedures and actions to defeat the legitimate rules of discovery, Gene presented the minor children to his psychiatrist. Then upon a trial on the merits he presented the psychiatrist's opinions and findings before the jury. Such action by a litigant, especially in a contested child custody case, should not be permitted. Such action thwarts and disregards the rules

of procedure and especially the legitimate, useful rules of discovery. Such a litigant should not be rewarded by admitting such inadmissible testimony. *See and compare Day & Zimmermann, Inc. v. Strickland,* 483 S.W.2d 541 (Tex.Civ.App.—Texarkana 1972, writ ref'd n.r.e.).

In *Day & Zimmermann,* the Texarkana Court held that the testimony of an expert witness relative to his conclusions or opinions or summaries based upon records or data, not introduced or produced, made such testimony by the expert actual double hearsay since the records or data, as here, were hearsay themselves. The tapes of the children were not properly admissible evidence under any exception to the hearsay rule. The alleged contents or recitals in the non-produced tapes were not admissible. An additional objection to the admissibility and a barrier to the admissibility was the fact that the expert psychiatrist was not properly authorized or permitted—in fact he was prohibited from testifying concerning his opinion and observations and viewing of the children during an unauthorized and forbidden encounter with the children. Neither Donna nor her attorney were present and Gene's actions and the psychiatrist's actions were violative of the court's order and of the rules of discovery. *Id.*

The *Day & Zimmermann* opinion was bottomed in part on then Tex.R.Civ.P. 167. An additional defect and an additional bar to the admissibility was the fact that the doctor's expert opinions had been based upon evidence, material or data that had not been made available to Donna or Donna's attorney. The tapes of the children involved in this point concerning the admissibility of the doctor's opinions were not shown to be in and of themselves admissible evidence; thus double hearsay occurred. The double hearsay coupled with the heavy taint of violating the rules of procedure and the rules of discovery constituted harmful error and reversible error brought about by the introduction of the testimony of Dr. Gripon. The doctor testified that he listened to audio tapes including Zach's which he used to form a basis of rendering his opinion in this case. In fact, Dr. Gripon testified in detail about the tape

of Zach. He had made a summary. And he stated that this young child had allegedly said certain things that theoretically or supposedly had occurred. But, when Zachary was asked who told him (Zachary) those things occurred, Zachary relates that someone else told him (Zachary). Zachary did not know of the occurrences firsthand; he had been told by Mimaw and others. Thus, it is clear that actually triple hearsay has been permitted before the jury through the doctor. Zachary reports on the audio tape certain things that he was told by his Mimaw, his maternal grandmother. There is a considerable and lengthy amount of testimony from Dr. Gripon concerning what Zachary had allegedly said on the tape.

The parties agree concerning the burden of proof that was imposed upon Gene in order to remove Donna as the sole managing conservator of the children—that pursuant to TEX.FAM.CODE ANN. § 14.08(c)(1) (Vernon Supp.1995), the petitioner or movant, Gene, had the burden of proving the following:

(1) that the circumstances of the child *or children,* the sole managing conservator, the possessory conservator, or other party affected by the order or decree have materially and substantially changed since the date of the rendition of the order or decree or judgment to be modified; *and also*

(2) the retention of the present sole managing conservator would be injurious to the welfare of the child *or children; and also*

(3) the appointment of the new sole managing conservator would be a *positive improvement for the child or children.*

Thus, it must be born in mind that in the analysis of this appeal that it must be shown that if Donna remained as the managing conservator, then her conservatorship would be injurious to the welfare of the children. But, further, the record has to demonstrate that Gene would be a positive improvement for the welfare of the children.

The record is a lengthy one including over 1800 pages, being 12 volumes of statements of facts accompanied by exhibits and audio and video tapes.

Donna argues that there is no direct evidence and no legal evidence showing that Donna's conservatorship was injurious to the welfare of the children. I think no such evidence exists certainly as to Matthew. Donna also argues in the alternative that the evidence is fatally insufficient and factually insufficient to show that her conservatorship was injurious. But, in addition to these arguments, Donna maintains that much evidence came before the jury that was inadmissible; but even with the inadmissible evidence there was no evidence or at the very best factually insufficient evidence touching upon Gene's burden of proof. Remarking on the lack of evidence against Donna, the court said and the record reveals:

The Court: Now, I addressed that back in my December hearings, and I said henceforth these children will never be picked up at the residence of Mrs. Ramsey, and Mrs. Chance with some reluctance disclosed where she lives. Now, Mimaw is the one that has been referred.... Now, I've heard very little of Mrs. Chance, the mother has done anything.

In relation to this observation and analysis by the trial court, Gene's counsel argued that his case "relative to harm" is based on the theory that Donna prompted the children to say uncomplimentary statements against Gene. But these were rank hearsay made under the control, if not the promptings, of Gene.

But Donna further argues that any supposedly improper conduct on her part arose because of certain reports by the children to her that were reasonably interpreted to demonstrate physical or even sexual abuse at the hands of the petitioner. Donna, the natural mother, having heard directly certain disturbing comments from the children, immediately called the child abuse hot line. These complaints of the children were voluntary—not taped. After that call to C.P.S., Donna followed up all steps which were in order and procedurally prescribed to her by the persons in authority concerning the welfare of the children. Donna further argues and maintains that it would have definitely been more harmful for her to neglect and fail to follow through on the comments of the children and then later to ignore the advise and counsel of the Child Protective Services.

Donna also knew that one Dr. Willis had determined that Zachary had inappropriate knowledge about sexual matters. But Donna generally argues that she was not proved nor were her actions proved to be injurious to the children. Gene argues otherwise.

With commendable candor, Gene has recognized that he has the burden of establishing that his appointment as the sole managing conservator would be an actual positive improvement for the children.

Gripon stated affirmatively the children of this very young tender age are not reliable historians. Children of such young age as these are particularly poor historians in the sense of a verbal recounting or verbal history. He did state that it was very easy for a parent to program a child to say certain things if the children are at the age of one year or two and a half years. Gripon admitted that children under the age of four or five cannot "abstract". Therefore, these children cannot tell whether another person is telling them the truth or not. These very young children have nothing to really test the truth by.

Gene explained that indeed he had gone to see Dr. Gripon after his counsel had sent him there because of his, Gene's, anxiety that had been in existence for some time.

Gene readily admitted that he brought the children to Dr. Gripon's office without a court order. Upon cross-examination when Gene was asked:

Q Did your lawyer instruct you to take these children to Dr. Gripon without a court order?

Gene's counsel objected saying: "That's falls into attorney-client privilege." The Court: "Objection will be sustained." The attorney-client privilege belongs to the client and not the attorney. The client alone can assert it; he can waive it.

But the attorney-client privilege and the privileged communications do not apply to future actions that are contrary to a court order. Swiftly, Gene conceded that he had not been granted the right to take the children to a doctor except in a true emergency. *Gene conceded* that Dr. Gripon had never examined the children and never actually talked to them or treated them. *Gene further admitted that he was aware* that his counsel had filed a motion to have the children involved examined and that Gene requested such a motion to be filed. The motion had not been presented and no order had been entered. The instructions in the charge of the court do not exclude the opinions of Dr. Gripon based on Zach's statements. Zach's double hearsay utterances did not provide Gripon any reasonably used or regularly used base in the field of psychiatry to express or admit an expert psychiatric opinion. No evidentiary base existed. Donna's counsel clearly preserved error by making specific objections and obtaining permission from the court to have a full and complete running bill of exceptions.

Further, it was shown that any expert opinions that the doctor voiced were beyond his designation as an expert witness for Gene. The Court then correctly observed that Dr. Gripon's testimony about the children was only that he saw the children with the father and that Gripon never interviewed then or talked to them or anything. Yet all of Gripon's opinions came into the evidence. Gene's able counsel when arguing before the trial judge at the charge conference declared concerning a certain requested (Donna's) jury instruction as follows:

But this would go to this particular No. 7, the court telling the jury to disregard an opinion of Dr. Gripon regarding taped statements of the child, Zachary, when that is absolutely necessary for that man to be able to hear those statements in order to properly treat my client and to realize or to understand what the effect and impact that is having upon these—his patients.

*But the boys were not Gripon's patients.* Gene's counsel argued that the psychiatrist could not properly treat Mr. Chance if the psychiatrist did not know what alleged comments or events were causing Gene's problems and the only way the psychiatrist can find out is for Gene to tell him or to hear the tapes of the child making those comments then—"That all goes to what his opinion is, and the jury should be entitled to weigh that evidence." So it is clear that Dr. Gripon's

testimony was offered as expert psychiatric opinion evidence. But under this record, that did not make the testimony admissible. The psychiatric opinions were tendered to remove Donna and appoint Gene. And the trial court still expressed its belief that the proper law would require that the jury be instructed to disregard all evidence of any statements said to have been made by the child Zachary to any persons except personally and directly to mental health care workers. But ultimately, the opinions of Gripon were admitted. Donna's first point of error should be sustained.

Appellant's point of error number two charges that the trial court erred upon rulings germane to the testimony of Cheryl Schultz. The error advanced was two-fold. One, the trial court refused to allow Donna's lawyer to question Cheryl Schultz concerning her statements to another witness and secondly, the trial court erred in refusing to allow Donna to make a bill of exceptions to questions and answers that should have been propounded to Cheryl Schultz. The petitioner, appellee, called Ms. Cheryl Schultz, as a lay witness. Cheryl was Gene's neighbor. During cross-examination, Donna's attorney asked Ms. Schultz whether during the actual trial of the case, she had talked to one Wanda Brumley. Brumley was a witness for Gene. Donna's counsel's questions were directed in part to whether Cheryl had conveyed information to Ms. Brumley that was in direct violation of the Code of Professional Responsibility. Mrs. Schultz was an attorney. The appellant's brief argues in substance that upon objection by Gene's counsel, the trial court said and the record reveals:

The Court: All right. I don't believe that's the tribunal for this, Mr. Matheny. There are other tribunals to hear those kind of matters.

But Mr. Matheny did ask other questions about Ms. Schultz's general interchange with the witness. Again, attorney for Gene objected. Then, the appellant's brief quotes:

The Court: I don't believe she's here in the capacity of an attorney. All right.

Whereupon Mr. Matheny requested at least to be allowed to make a bill of exceptions and to question Ms. Schultz regarding her conversation with the witness. Whereupon the trial court responded:

The Court: I'm not the grievance committee.... I've got all the problems I can handle without that.

At the end of Ms. Schultz's testimony, Donna's counsel stated:

Mr. Matheny: Would you just ask her to stay when they stop, where I can put that on outside the presence of the jury?

At this point, the jury was recessed to the outside of the courtroom. Then the record shows:

Mr. Matheny: I just want to ask about what was said to Wanda Brumley.

The Court: I'm not going to permit that. This is not the forum for that.

Mr. Matheny: May I make a talking bill.

The Court: Mrs. Schultz, you do not have to answer the questions.

Mr. Matheny: I would ask the witness if she told the witness, Wanda Brumley, that she should not be talking to me, Mike Matheny, one of the attorneys for Donna Chance, because she was supposed to be a witness for the other side, the other side of Gene Chance. And that she instructed her not to talk with me. I'd ask her whether she said something along that line.

I would further ask her what exactly she said. I would further ask her was that not an incorrect statement of the law. And that since she was a trial lawyer, why did she make an incorrect statement of law to Wanda Brumley. And that would be the question, Judge, and that's all I have.

Mr. Smith: May I be heard on that?

The Court: Yes.

Mr. Smith: Your Honor, I feel that any litigant is entitled to make a bill of exception as to the questions. I feel that it's improper to ask those questions that he just listed in the presence of the jury. But I do feel that as a matter of appellate law that he would have the right to fill in the gap. To show what question and answer—

The Court: I interpret alleging the lady of professional misconduct. This is not the forum that tries those issues. Are you

alleging that she's committed some kind of professional misconduct?

Mr. Matheny: That may be your interpretation.

The Court: I don't know what other interpretation one could have.

Mr. Matheny: I don't intend for it to be that way. All I'm trying to show is that she is biased towards Gene Chance and she made a statement that was biased towards Gene Chance. Nothing about grievance committees or nothing else.

The Court: Mrs. Schultz, you're here as a witness. Like I say, I interpret the matters that Mr. Matheny is alleging as some sort of professional misconduct. If you want to answer these questions, you're free to do so or not. I do not think I am the forum to be evaluating this kind of conduct. Now, If I find lawyers are contemptuous to me, I am the forum. Now, you are free to answer these questions or not.

The Witness: I choose not to answer, your Honor.

The Court: All right. What else do you want to do? You want something?

Mr. Smith: No, sir.

The Court: All right.

The Witness: May I be excused?

The Court: Fine, anything else?

Once again, at the close of all of Ms. Schultz's testimony, Mr. Matheny requested the court to not excuse the witness. Attorney Matheny simply requested that Ms. Schultz stay so that he could preserve her excluded testimony in a proper bill of exceptions outside the presence of the jury. Note that the issue of professional responsibility was abandoned. Grievance Committee matters, if any, were disavowed.

Notice that Mr. Smith, Gene's lawyer, stated that "any litigant is entitled to make a bill of exception as to the questions." Denying to a litigant the right to make a bill of exceptions is error of the reversible kind. Donna's lawyer had a right to show cogent bias in favor of Gene as impeachment. The scope of impeachment is broad in Texas. In the case of *In re: The Marriage of Goodwin,* 562 S.W.2d 532 (Tex.Civ.App.—Texarkana 1978, no writ), the intermediate appellate court held: the judgment in the *Goodwin* trial was reversed for failure to allow the making of a bill of exceptions to be made during the litigation in question and answer form.

Mr. Goodwin appealed from a judgment of divorce on the grounds that he was denied a hearing on certain issues that were involved and that he was deprived of the right to obtain a record or to perfect a bill of exceptions to his action of the trial court.

Chief Justice Cornelius for a unanimous court wrote at pages 533–534:

From a review of the foregoing facts, and regardless of the other contentions raised here, we think it is clear that appellant was denied the opportunity to make a bill of exceptions as permitted by Tex. R.Civ.P. 372. When the testimony of a witness is excluded, the aggrieved party, in order to obtain a reversal based upon the court's action, must show by a bill of exceptions what the witness' testimony would have been. *De La Hoya v. Saldivar,* 513 S.W.2d 259 (Tex.Civ.App.—El Paso 1974, no writ); *Bowles v. Bourdon,* 213 S.W.2d 713 (Tex.Civ.App.—Galveston 1948), *affd,* 148 Tex. 1, 219 S.W.2d 779 (1949); *Johnson v. Poe,* 210 S.W.2d 264 (Tex.Civ.App.—Galveston 1948, writ ref'd n.r.e.). And it is reversible error to refuse a party the opportunity to perfect such a bill of exceptions. *Biggers v. State,* 358 S.W.2d 188 (Tex.Civ.App.—Dallas 1962), writ ref'd n.r.e. per curiam, 360 S.W.2d 516 (Tex. 1962); (citations omitted) . . .

Tex.R.Civ.P. 372 provides in part that:

"If either party during the progress of a cause is dissatisfied with any ruling, . . . or other action of the court, he may except thereto at the time said ruling is made, . . . and at his request time shall be given to embody such exceptions in a written bill. . . .

. . . . .

(1) Anything occurring in open court or in chambers that is reported and so certified by the court reporter *may be included in the statement of facts*

*rather than in a bill of exception; ...".* (Emphasis in original opinion.) .... we hold that the appellant had the right under Rule 372 to make his bill by questions and answers and to have the same included in the statement of facts. We find nothing in the cases to indicate that, in a situation of this kind, the trial court has the discretion to relegate a party to the use of separate, formal bills of exception only.

In *Rogers v. Rogers,* 561 S.W.2d 172 (Tex. 1978), the court held that the Texas Family Code requires that a record be made in all suits affecting the parent-child relationship unless waived by the parties with the consent of the court. Thus, the Family Code places a duty upon the court to make a complete record. Donna was denied a record for appeal. TEX.FAM.CODE § 11.14(d), (e) (Vernon 1986). This code mandates that: "A record shall be made ... unless waived by the parties...."

The record clearly reflects that Ms. Schultz was an able, experienced trial attorney employed with the law offices of Gilbert Adams, Jr., the owner of the firm, and that she practiced with about six other lawyers in the firm. She was a close neighbor to Gene and Melissa Chance and they attended the same church together virtually every Sunday. She stated that she and her husband had become good friends of Gene and Melissa and were very good friends to Gene's children. She testified that Matthew appeared to be very bonded to Melissa for some reason. Donna's attorney was attempting to show that this witness had a strong bias and was greatly prejudiced in favor of Gene by showing that she had talked to another important witness in the case and apparently had advised that witness not to talk to Mr. Matheny.

Matheny explained to the court that he wanted to show her bias and present disposition in this case. When Cheryl was asked if she told another witness, Wanda Brumley, not to talk to Matheny because Brumley was going to be a witness for Gene, Cheryl's response was that "I don't know any of the names of the witnesses." Donna through her attorney had a right to attempt to show bias

and prejudice on the part of this witness against Donna's cause and thereby attempt to diminish Cheryl's credibility. Donna's counsel was trying to establish what had taken place and what words were spoken and what conversation was had between Cheryl and Wanda Brumley, both important witnesses for Gene. If Donna could prove that a trial lawyer had disregarded her Code of Professional Responsibility or misquoted the law, then cogent, strong, impeachment existed for the jury's consideration.

Donna's attorney's request to the court to ask Cheryl to stay for a bill exception was denied. It is clear from the record that Donna's counsel was not even given the chance to make a bystanders bill and that the witness was instructed by the trial judge that she did not have to give any answers on a bill of exception. And she could leave at once.

When testimony is excluded, especially on cross-examination which is the ultimate tool for seeking the truth, then a party has the right to make a bill of exceptions. The party can elicit the witness' testimony by questions and answers which questions and answers are recorded by the official court reporter and included in the statement of facts or by preparing a separate formal bill of exception which describes the court's ruling and includes a summary of the facts which the witness would have related had he been allowed or required to do so.

Ms. Cheryl Schultz made it clear that she was a trial lawyer of experience and that she worked in the office of Gilbert Adams, Jr., who was the founder of the firm and Mr. Earl Stover, Jr., worked also in the Beaumont office with Ms. Schultz. Query: Could that relationship had any impact on her refusal to give a bill of exception? It must be remembered that she declined to stay so that Matheny could make a bill of exception outside the presence of the jury and she was permitted to leave immediately without giving a question and answer bill of exception.

However, here, under the instruction of the court Ms. Schultz would not and chose not to answer or to remain. Donna could not *make* a meaningful bill of exception under either method. Ms. Schultz was excused to

leave. Donna was dissatisfied, but under the court's rulings could not proceed under TEX. R.APP.P. 52(c)(8).

Chief Justice Cornelius clearly held, that even though the appellant could have prepared separate, formal bills of exceptions containing summaries of the expected testimony: *"we hold that the appellant had the right under Rule 372 to make his bill by questions and answers and to have the same included in the statement of facts."* *Goodwin,* 562 S.W.2d at 534. Former TEX. R.CIV.P. 372 is now TEX.R.APP.P. 52 in substance.

Since the witness was excused and left and since the witness declined to answer as per the court's instruction, it was impractical and indeed impossible for Donna to bring forward any meaningful testimony for the purpose of the statement of facts in this case. Donna's rights were violated in that she could not present the complaint on appeal. Donna was prevented from making a proper presentation of her point and complaint *and her case on appeal.* TEX.R.APP.P. 81(b)(1). The errors at trial are not remediable. TEX. R.APP.P. 81(a). The Texarkana Court further held that the trial judge did not have the discretion to relegate a party to the use of separate, formal bills of exceptions only. *Goodwin,* 562 S.W.2d at 533–534, is directly on point.

The procedural and substantive errors on this matter are grievous.

Appellant, Donna, reasonably and correctly argues that Brumley was an effective witness for Gene. Therefore if Ms. Brumley's testimony had been influenced, colored, or limited by Ms. Schultz, then harm resulted. The outright refusal to allow an effective, informative and complete bill of exceptions for purposes of appeal denied Donna the fundamental right to fully present and to preserve for appellate review the cross-examination of this witness. Point of error two should be sustained; it shows reversible error. Here, Donna's counsel fully complied with TEX. R.APP.P. 52(a) by making a timely request and stating specific grounds for his request. He obtained a ruling of the court. It was not necessary to formally except. Donna's rights were violated. It was impossible for her to exercise her rights under Rule 52. The preservation of her complaints for appellate review was denied Donna.

Appellant's point of error number five states that the trial court erred in its rulings regarding the testimony of William Bender, Ph.D. He was Gene's witness. The trial court allowed Dr. Bender to testify although Gene had failed upon a proper discovery question to inform Donna of that expert's impressions and opinions and in allowing the doctor to testify based upon hearsay. Bender's testimony exceeded his designation as an expert witness.

Dr. Bender had a Ph.D. in special education. In response to interrogatories, Dr. Bender had been identified as an expert in research on false allegations of abuse.

TEX.R.CIV.P. 166b(2)(e) provides that discovery is allowed of the mental impressions and the opinions of experts. A party may obtain discovery of the identity of an expert who may be called as an expert witness. The subject matter of his testimony and the mental impressions and opinions held by the expert and the facts that are known to the expert which relate to and form the basis of the mental opinions and impressions held by the expert must be forthcoming. Gene *failed to comply* with Rule 166b(2)(e)(1). The interrogatories must be answered fully. If not, the expert's testimony is inadmissible. TEX. R.CIV.P. 215(5). The relevant answers were incomplete and evasive. The impressions and opinions of Gripon and Bender were not given in answers to proper interrogatories. Gene's incomplete answers were never supplemented.

Point of error three challenges the trial court's rulings on Frank Stubbs' testimony as well as comments made by the court about or against Frank Stubbs personally. Stubbs was Donna's expert witness concerning a number of vulgar, profane writings or messages in public places allegedly made by Gene about the maternal grandmother. Mimaw's business phone number was listed in the public places. It was alleged Gene made the vulgar, insulting writings in several public places. Stubbs was a handwriting expert.

The handwriting of Gene was in question and this issue was material and crucial.

Appellant argues that the trial bench erred in refusing to allow into evidence a certain exhibit which was comprised of known examples of the handwriting of Gene and was considered, studied and analyzed by Frank Stubbs and secondly in commenting on the weight of the evidence during the testimony of Frank Stubbs. Donna took the position that Gene had written on certain walls in public places certain deviant, derogatory, sexual messages about Mimaw.

Frank Stubbs clearly qualified as a handwriting expert. He had been studying the art of examining handwriting for about 30 years. He had testified as a handwriting expert and had testified as to the comparisons of writings in the district courts of Orange County, Jefferson County, Liberty County, Harris County, Hardin County, Tyler County, and Washington, Indiana. He had done work for the Jefferson County Criminal District Attorney's Office, the Texas Department of Public Safety, the Texas Rangers, and other entities in the States of Louisiana and Arkansas. He had worked with several Sheriffs' Departments in southeast Texas. He had done work for banks, credit cards holders, and oil companies in his line of expertise.

At the request of Donna, Stubbs had examined and viewed certain locations in Jefferson County and gone to certain car washes and to three telephone booths. The booths were located within about half a mile from a certain house. The house was located near Twenty–Fifth Street and Twin City Highway in Groves, Texas. Gene lived near to this intersection. Stubbs examined several other locations. He examined known examples of Gene's handwritings and signatures on checks, on an anniversary card, and on other notes that were definitely established as the handwriting of Gene.

As a predicate, Stubbs testified that he had exhibits and known examples and writings of Gene. Respondent Donna proffered Exhibit No. 14. Stubbs was asked based upon his own experience and expertise if he had an opinion as to who wrote the writings on 14. He had answered affirmatively,

"Yes"—stating that it was the writing of Mr. Gene Chance. Whereupon Donna tendered the exhibit into evidence. The alleged graffiti or the writings made in several of the places visited by Stubbs had contained, inter alia, the business phone number of Donna's mother.

Stubbs was shown certain exhibits, No. 15 and 16, which were photographs of certain writings on certain walls. Stubbs had previously examined these writings, concluding that Gene had written these writings and messages. As a basis of Stubbs' handwriting comparisons and Stubbs' conclusions, he was handed respondent's Exhibit No. 18. Exhibit No. 18 consisted of certain checks, an anniversary card, a deposit slip, a United States Income Tax Return, a signed contract, as well as an affidavit all signed by Gene. Also offered for comparison was a deed of trust signed by Gene. Stubbs was asked whether these matters and writings contained in No. 18 were documents that were studied and analyzed and utilized to form his opinion regarding certain handwriting on a wall. Stubbs answered that he had used all of these documents and exemplars in making his determinations and in reaching his final conclusions.

Stubbs was then taken on voir dire. The voir dire was an attempt to discredit Stubbs by contending that Stubbs had previously stated that the only thing he used as a comparison were two certain checks. The handwriting witness, Stubbs, pointed out that he had used the checks in preparing a certain previous exhibit but that he did also *use a number of the other documents in making his overall comparisons.* In fact, Stubbs testified that he had spent several hours looking at various known handwriting exemplars. Stubbs testified that he had approximately a week or maybe ten days to go through "all this" in preparation for trial.

The record reflects that although Stubbs had used certain documents or exemplars in preparing a certain earlier exhibit, nevertheless he later had gone further in that he had considered other exemplars in arriving at his overall comparisons and final conclusions.

Stubbs had been pressed for time to get ready for another and previous hearing in this suit in the previous December before the May jury trial and the record does reflect some confusion as to what cards or written matters were submitted to Stubbs by way of voir dire examination. On further voir dire, Stubbs was cross-examined about a certain card and whether or not he used it on a certain exhibit. Stubbs explained that he did not use that card on the exhibit because of the lack of time and because of the imminent setting of the December hearing.

At some period of time after the December hearing, when he had ample time, he did use the card and he did analyze the card as a comparison to Gene's authenticated and known writings. He had time to analyze the card as a comparison and he also used the card as a comparison to certain unknowns. The card was a known authenticated writing or exemplar of Gene's handwriting. The card was an anniversary card from Gene and was analyzed and employed among numerous other known writings to prepare Respondent's Exhibit No. 18. Exhibit 18 was properly tendered. However, the court excluded No. 18.

Stubbs, certainly an expert witness, was entitled to explain the chronology of his activities in regard to the litigation. Excluding No. 18 was error. It is considered settled law in this State that statements or conduct that are either inconsistent or appear to be inconsistent with positions and statements taken at a subsequent trial or later time, are admissible evidence. The jury is to pass upon the weight and probative force to be given to such evidence. Inconsistent statements made in the same trial are for the jury. Such an inconsistency, if any, did not eviscerate Donna's Exhibit 18. *See and compare Bangor Punta Acceptance Corporation v. Palm Center R.V. Sales,* 661 S.W.2d 237 (Tex.App.—Houston [1st Dist.] 1983, no writ). After Respondent's Exhibit No. 18 was refused admission, the court also refused to permit into evidence Respondent's Exhibit Nos. 13 and 19. These exhibits consisted of a poster comparison prepared by Stubbs and also a report that Stubbs prepared regarding his analysis of certain handwritings on certain public places and walls.

The record reflects that Stubbs was questioned by Gene's counsel at voir dire about one of the respondent's exhibits that had been referred to. Thereafter Donna tendered the exhibit into evidence, being Exhibit No. 13. *Without complaint or objection from Gene's attorney, the court refused the same.* This exhibit showed the items that Stubbs had considered and had measured and analyzed. Also, Exhibit No. 19 was properly tendered. Exhibit No. 19 was Stubbs' report.

Gene's objection was that Exhibit No. 19 is a report and that it would be bolstering the testimony of Stubbs. The bolstering objection was sustained. Several reports of Gene's witnesses were admitted, however. Stubbs has been hotly questioned by Gene's counsel. These facts, exhibits, and reports, were important in that they demonstrated how Stubbs had reached his final conclusion that Gene had written the writing on the walls in question. One exhibit clearly established that numerous documents other than the original two checks (including an affidavit, a board of relator's contract and exemplar, brown wrapping paper, and an anniversary card), inter alia, were all utilized in Stubbs' comparisons. These several erroneous rulings of the court as to Stubbs and as to the documents, reports, and exhibits had the definite effect of diminishing and lessening the force and weight of this expert witness' testimony as well as his credibility.

Donna also forcefully argues that the trial court's "direct comments" on Mr. Stubbs' personal character and as a witness did her greater harm.

Another exhibit of the respondent was tendered. It was a combination and compilation of various pictures which was to demonstrate truly and correctly the various pictures and photos Stubbs had taken and those that he could plainly see and those that he could not see very well. Some of the photos were not clear; they were not developed clearly. Some of the pictures had been taken in dark conditions. Upon direction, the witness made a stack of pictures that he had taken and he testified that some of the pictures

that he had actually taken truly and correctly depicted and reflected what these pictures purported to show. An objection was made and the record reflects:

The Court: Let me look at them.

The Witness: May I divide out the ones that were not usable?

The Court: All right. What's the objection, Mr. Smith?

Mr. Smith: Your Honor, the witness has testified—

The Court: I think he's testifying as a photographer. They'll be admitted as a photograph. *He goes around taking pictures of dirty words.*

. . .

Mr. Matheny: May I introduce those to the jury?

The Court: If they want to look at them. *I don't recommend them, particularly you ladies.* (Emphasis added.)

The words of the court that he (Stubbs) goes around taking pictures of dirty words is clearly a comment on Stubbs as a witness and as a person and a derogatory direct comment on his credibility and his character. This remark certainly is direct and personal and it attacks the weight of the evidence. It seems altogether reasonable to arrive at the conclusion that it influenced the jury. *See City of Houston v. Pillot,* 105 S.W.2d 870 (Tex.1937).

It has been a long standing rule in Texas courts that such a comment, disapproving the action of the witness and castigating the type of person the witness was, constitutes serious error. The court's remark that Stubbs "goes around taking pictures of dirty words" is more than a comment; it is a remark of scorn and ridicule. The "dirty words" were relevant to controlling issues involving Gene and his parenting skills.

Moreover, the court did not *recommend certain pictures,* being evidence in the case and specifically pointed out that *these were not recommended to the ladies.* This remark is clearly calculated to invite the female members of the jury not even to look at or to consider certain important, pictorial evidence. In brief, the court below recommended that the jury and especially the la-

dies on the jury not *even view the admitted, relevant evidence.* Clearly that warrants reversal. The appellant's brief takes the position that the Stubbs's pictorial evidence had important bearing on the petitioner's traits of character and personality as well as his parenting qualities. The court's condemnation of Stubbs reflects on the entirety of his testimony. These instructions and recommendations to the jury and the ladies was much more than a direct comment on the evidence. Such action and words would clearly convey to the jury the position and the opinion of the court, which was that Stubbs was despicable. This important body of evidence would have certainly directly impacted upon Gene's credibility since he denied these writings; but the court's comments rescued Gene's credibility. Donna was denied a true jury trial on this witness and his expert testimony.

In *Pillot,* the court stated in substance that it is always incumbent upon trial judges to exercise the greatest care in preventing the jury from ascertaining the views of the court upon the credibility of the witnesses and the weight to be given their testimony and if it appears even reasonably doubtful that a party is prejudiced by the comment of the trial court, *then the case should be reversed. This case should be reversed.*

In a separate point of error the appellant argues that the trial court erred in commenting on the weight of her evidence by its actions towards the trial attorney representing Donna. Donna alleges that the trial bench made certain comments that reflected very adversely upon her trial attorney, Mr. Matheny. Donna argues that the trial court's opinion of this attorney became evident with a comment and dialogue which took place prior to a hearing. Donna states that the first comment took place when her attorney asked Gene if he swore under oath that the home that Donna and Gene lived in was the separate property of Gene. An objection was made on the grounds of non-relevancy and that it was a pre-divorce matter. Whereupon Donna's attorney made a request:

Mr. Matheny: May I approach the bench and show the court how I'm going to tie this in exactly—

The Court: We could have done all this in recess. Ladies and gentlemen, you'll have to take a short recess while I rule on matters of law. Go outside please. This is going to be involved.

This statement took place in front of the jury because immediately afterwards the jury was recessed outside the court.

Appellant further argues that such a statement or pronouncement by the trial judge lead the jury to conclude that Mr. Matheny was wasting their time as well as the court's time. Donna next advances an additional exchange showing prejudice against Mr. Matheny. *In the presence of the jury the following took place.* There had been a certain tape played to the jury and then on redirect examination Gene was asked about certain conversations or exchanges or words spoken between Gene and Donna germane to and on the tape. Gene was asked to interpret the tape. Donna's objection was that since the tape had been introduced, the tape could speak for itself. The tape had been played to the jury. The record:

Mr. Matheny: But then he is now attempting to say what was said on the tape.

The Court: *I don't think he's doing anymore than you did while ago.*

Mr. Matheny: *That may be, but you wouldn't let me.*

The Court: *I've ruled. You may have a seat.*

Mr. Matheny: *May I make —*

The Court: *Sit down.*

Mr. Matheny: *May I make an objection while I'm sitting down?*

The Court: *Stand up and make your objection, however nice you want to be.*

Mr. Matheny: *I'm just trying to follow the rules.*

Donna maintains that it was clear from this part of the record and other parts that the trial court had lost his patience with Mr. Matheny and that the court's disapproving perception of Mr. Matheny was conveyed to the factfinders. This harmed her case substantially. Throughout the trial, Mr. Matheny acted correctly and professionally; he did not provoke the court. Matheny many times asked permission to approach the witness or

the court. Donna makes a complaint about a third harmful incident displayed before the jury. Donna argues her lawyer was interrupted and prevented from cross-examining a critical, adverse witness. This matter is in the unpublished dissent. (Second part.) Point four should be upheld.

Appellant argues in point of error eight that the court's refusing to give as a part of the court's charge certain requested instructions of Donna constituted error. The court instead committed error by giving the instruction that it did regarding the statements of the child Zachary. The charge of the court to the jury contained six jury questions. They were:

### QUESTION NUMBER ONE

Should Donna René Chance be removed as sole managing conservator and Gene Ray Chance be appointed sole managing conservator of the children named below.

Answer "Yes" or "No" for each child.

Zachary Raymond Chance:  Yes

Matthew Logan Chance:  Yes

### QUESTION NUMBER TWO

Has Mother committed acts that are emotionally or physically endangering to the minor child, *Zachary* Chance?

Answer "Yes" or "No."

Answer:  Yes

### QUESTION NUMBER THREE

Has Father committed acts which are emotionally or physically endangering to the minor child, *Zachary* Chance?

Answer "Yes" or "No."

Answer:  Yes

### QUESTION NUMBER FOUR

Has Mother committed acts which are emotionally or physically endangering to the minor child, *Matthew* Chance?

Answer "Yes" or "No."

Answer:  Yes

## QUESTION NUMBER FIVE

Has Father committed acts which are emotionally or physically endangering to the minor child, *Matthew* Chance?

Answer "Yes" or "No."

Answer: <u>Yes</u>

## QUESTION NUMBER SIX

Was Father's Motion to Modify filed frivolously or designed to harass Mother?

Answer "Yes" or "No."

Answer: <u>No</u>

The instruction given was:

You are instructed to disregard all evidence of any statements said to have been made by the child, Zachary Chance, to any person, except (1) any statements made personally by him to any mental health care workers, or (2) statements allegedly made by him that you find were considered by mental health care workers.

*Zach did not make any statement to Gripon.* But wrongly Gripon was excepted. Under the plain wording of this instruction, the trial court told the jury to regard and not to disregard any statement made by Zachary to any health care worker or any statement or statements allegedly made by Zachary that you [the jury] find were considered by the health care workers. Under settled Texas law the jury had a right to disregard all inadmissible hearsay statements. The jury in Texas by ancient precedent, continually reaffirmed, has a right to disbelieve all of a witness's statements and certainly the jury has a right to disbelieve and disregard all hearsay statements.

The charge of the court did not tell the jury that they may or may not consider or may or may not weigh the hearsay statements allegedly made by the very young child directly and personally to the health care workers but rather that the jury was not to disregard the hearsay statements allegedly made by Zach to the mental health care workers or even any statements allegedly made by him that were in some manner considered by the health care workers. This was error.

Thus, the jury was allowed to consider the double hearsay statements attributed to Zach that were relayed to Dr. Gripon, or Dr. Bender. The jury should not be instructed to consider or to weigh the young child's hearsay statements, based on double hearsay, because of its inherent unreliability when made by the child, as here, under a coercive situation. The objected to hearsay statements by Zach were made under a situation wherein the father was doing and controlling the taping. The instruction was hostile to the basic rule of evidence which disallows hearsay. When such an instruction to the jury affirmatively contains or embraces an erroneous rule of law or erroneous rule of evidence on a material and substantial issue, the erroneous instruction constitutes reversible error. *See Winfield v. Renfro,* 821 S.W.2d 640 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

The alleged statements which were made by Zach certainly are crucial and indeed pivotal to the jury's consideration of the jury questions concerning Zach. The instruction under this record is relevant and germane if not greatly controlling of the very core of the controversy as to Zach. It was erroneous. Reversible error resulted.

Donna's trial attorney preserved this error by adequate and specific objections to the instruction. But in addition, correct, timely instructions were requested by Donna. These correct instructions were refused. The failure to give a correct instruction in the charge allowed the jury to consider any and all hearsay statements that were attributed to Zachary if in some manner they reached a health care worker even indirectly. Triple hearsay and hearsay within hearsay was admitted before the jury.

Zach's statements were on an unauthenticated tape which was furnished by Gene to Dr. Gripon. This tape was not produced or proffered. Thus included for the jury's consideration were double hearsay utterances of Zach made to Dr. Bender by Gene and to Dr. Gripon and would include all the hearsay statements made by Gene or Melissa Chance or Cheryl Chance on the secret tape that was made in Dr. Lane's office without Lane's knowledge or consent. The trial court fell

into error by refusing to limit the jury's consideration to those actual statements which were made in person by Zach directly to a mental health care worker. The jury was free to consider double hearsay and there was simply no chance to cross examine the hearsay declarants. Some triple hearsay came before the jury. The tool of cross examination is the important tool to get at the truth. A correct instruction was requested that the jury should disregard the psychiatric opinion of Dr. Gripon that related to and was *based on the taped statements of the child Zachary*. The refusal of the requested instruction concerning the opinions of Dr. Gripon was especially erroneous. The core issues were tried in violation of the rules of evidence.

Furthermore, it should be stressed that Dr. Gripon swore that the children were not his patients and certainly Zach's hearsay statements under the circumstances here should not have been the basis for Dr. Gripon's testimony or his opinions.

Neither the record nor Dr. Gripon even attempts to establish that such double hearsay testimony and ex parte hearsay, taped testimony was regularly used in his field of expertise as a means or a manner on which to base an expert psychiatric opinion. Furthermore, Dr. Gripon's opinions and testimony were well beyond his designation as a witness as set forth in response to interrogatories. The trial court was correct in observing and stating that Dr. Gripon only *saw the children with the father* and had never interviewed them or even had a conversation with the young boys. But Gripon's total evidence was allowed.

Thus, Dr. Gripon could not use as a basis for his evidence the unauthenticated double hearsay, taped statements to establish or demonstrate the effects of the alleged actions of Donna upon the children. Egregious harm and injury resulted to Donna.

The repeated refusal to submit properly worded and timely requested instructions has been held to be reversible error where the instruction was necessary to enable the jury to render a proper verdict. The refusals were reasonably calculated to cause and probably did cause a rendition of an improper verdict and judgment. This is the situation in this appeal. *See Riggs v. Sentry Insurance,* 821 S.W.2d 701 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *Chemical Express Carriers v. Pina,* 819 S.W.2d 585 (Tex.App.—El Paso 1991, writ denied); *Carr v. Houston Business Forms, Inc.,* 794 S.W.2d 849 (Tex.App.—Houston [14th Dist.] 1990, no writ).

It must be emphasized the utterances said to be made by Zach were bootstrapped by a controlled, manufactured tape into actual statements (taken as true) used by Gripon to form his testimony and opinions. *See and compare In re: T.L.H.,* 630 S.W.2d 441 (Tex. App.—Corpus Christi 1982, writ dism'd); *Fleming v. State,* 819 S.W.2d 237 (Tex. App.—Austin 1991, writ ref'd).

Also Dr. Gripon's testimony and opinions were in violation of statutory law. *See* Tex. Fam.Code § 11.14. The trial court's instruction, as given, amounted to harmful error and clearly favored and emphasized Gene's theory of the case. The Ninth Court should sustain Donna's point of error eight. Reversal is required.

### *The Factual Insufficiency Issue and the Overwhelming Weight and Preponderance of the Evidence Issue*

Point of error number nine advances the trial court erred in the charge to the jury and also in accepting the verdict of the jury and in rendering a judgment upon the verdict of the jury because: (a) there was no evidence to support the submission to the jury questions one, two, and four; (b) there is no evidence to support the jury's answers to questions one, two, and four; (c) the evidence is factually insufficient to support the findings of the jury and responses to questions one, two, and four; (d) the findings of the jury in response to questions one, two, and four are so against the great weight and overwhelming preponderance of the evidence as to be manifestly unfair and clearly unjust; and that the verdict within itself (e) contains conflicting findings—specifically that Gene should be appointed sole managing conservator while at the same time the jury found that Gene had engaged in acts that were

emotionally or physically endangering to the children.

In analyzing and passing upon a "no evidence" point or a "legally insufficient" point an intermediate appellate court must consider only the evidence that is favorable to the question and to the jury's answer to the question. The intermediate appellate court must disregard all evidence that is contrary to the jury's findings. The appellate court must accept all reasonable, favorable inferences that flow logically and reasonably from the evidence that are in favor of the jury's answers and supportive of the jury's findings. Thus, this Court can consider only those inferences that support and sustain the jury's findings. Contrary inferences must be totally disregarded.

It must be stressed that in view of the wording of Jury Question No. 1 the appellate review must be analyzed along the lines of whether Gene met his burden that there had been a material and substantial change since the date of the rendition of the divorce judgment and that the retention of the present sole managing conservator, Donna, would be injurious to the welfare of each of the boys and further that the appointment of the new sole managing conservator would be a positive improvement for each boy. Tex.Fam. Code § 14.08(c)(1).

In my opinion, it is not necessary or appropriate to reach the "no evidence" point as to Zach. But, it should be stressed that the court below was barred by rules of law and evidence from giving weight and instructing the jury to regard, the hearsay evidence offered to prove a vital fact by the party having the burden of proof on that vital fact. *See and compare Cecil v. Smith*, 804 S.W.2d 509, 511 n. 2 (Tex.1991). I would opine that the testimony is lacking and absent that there were any specified complaints of any credibility shown by admissible evidence demonstrating any deficiency on the part of Donna. This is obvious as to Matthew. The record is plainly favorable as to how Donna cared for the children, the condition of their living and how they were fed, bathed, or clothed. There is certainly *no* adverse credible admissible evidence of probative value showing that Donna took ill care of the children and that she afforded them detrimental living conditions or that they were poorly fed or poorly clothed and not bathed regularly.

It is true that Dr. Gripon expressed the opinion and insinuated that prompting a child to make uncomplimentary false allegations against the other parent would be harmful to the child, but as discussed above his testimony was inadmissible and even if his expert opinions were to be considered, there is no credible evidence above a scintilla in the record that Donna did any prompting of the children to make uncomplimentary and false allegations and accusations against the other parent.

But, more certainly there is no admissible evidence that exceeds a scintilla to support the finding that the retention of Donna as managing conservator would be injurious to the minors. In addition, Donna has correctly drawn points of error challenging the factual sufficiency of the evidence to support the verdict and also a well-briefed point that the jury's verdict was against the great weight and preponderance of the evidence. Donna did not have the burden of proof; the burden of proof rested upon Gene.

Wanda Kendall was a licensed therapist who was also a clinical practitioner as well as a licensed chemical dependency and sex offender counselor and treatment provider. Ms. Kendall was referred to see Donna, Zachary, and Matthew by Child Protective Services. Totally unlike Dr. Gripon and Dr. Bender, Ms. Kendall actually saw and spoke to the children in this case under a direct referral from C.P.S. Ms. Kendall testified that the actions of the father had been injurious to the children. She testified in substance that considering the attachments of these very small children to the mother that a change of custody would be very harmful to both of the children. To remove these children from their mother would be detrimental to them.

Concerning Zach's inappropriate sexual knowledge, Ms. Kendall replied that in her mind something had happened for Zach to say things that he said to her on one occasion. But she would not validate sexual abuse out of that. Importantly, Wanda

Brumley, a witness for Gene testified that the child involved, Zach, never stated that Donna or even Donna's mother was telling the child what to say. Brumley affirmatively testified that Donna's home was appropriate and that no health hazards existed and that the children were in good physical condition.

Sergeant Bill Davis of the Beaumont Police Department was called to the stand. Sergeant Davis was assigned to the Sex Crimes Division. Sergeant Davis testified that based upon the report from Dr. Wills and the fact that the doctors thought something had happened to the children, he would assume that something did happen. Dr. Will's assessment of what happened with the children was meaningful. Sergeant Davis further gave testimony that if a young child possesses or apparently exhibits some sort of inappropriate sexual behavior, it would be fitting and proper for a parent to investigate. This explained Donna's calls to C.P.S.

This witness, shown to be knowledgeable under the record, testified that there exists a positive connection and correlation between drug and alcohol abuse and child molestation.

Concerning the problems of alcohol abuse in regard to Gene, Officer Allen Reddick testified as to the incident that took place on the beach between Donna and Gene. Officer Reddick's test of Gene found that Gene's eyes were not able to follow the stimulus smoothly, that his eyes had involuntary eye movement, that the condition existed in both eyes and that this was a test routinely utilized when checking for intoxication. In fact, the officer concluded, based upon his findings in the eye test, that Gene Chance was intoxicated. The officer stated that he did not charge Gene with driving while intoxicated for the simple reason that he could not put Gene behind the wheel of the car. The officer interviewed Gene at or near Gene's beach house. Gene has taken the boys to the beach even though Matthew's doctor had advised against it. Additional details about the beach incident are in the third part of the unpublished portion.

From the record it becomes evident that the jury's answers to questions one, two, and four are against the great weight and preponderance of the evidence so as to be mani-

festly unfair and clearly unjust. And indeed, the jury made a specific finding that the father committed acts which were and are emotionally or physically endangering to the minor child Zachary and Matthew. The jury findings that Gene had engaged in acts that were emotionally or physically endangering to the children and the jury's finding that Donna should be removed as the sole managing conservator and that Gene should be appointed sole managing conservator are conflicting findings.

In simple logic, *but especially under this record,* if a parent has committed acts that are emotionally or physically endangering to a very young boy, then the appointment of that same party cannot be considered a positive improvement. These two issues with the answers thereto are in conflict under this record. *See and compare Pearson v. Doherty,* 143 Tex. 64, 183 S.W.2d 453 (1944). No logical and reasonable way exists in this writer's view to reconcile these conflicting and mutually destructive findings under any reasonable construction under this record. These conflicting findings require a reversal of the judgment and a remand of the cause. It must be borne in mind also, that it was Gene's burden—not Donna's—to prove first that Donna should not be retained as managing conservator and she was injurious to the boys and secondly, that he would be a positive improvement. The record shows by overwhelming evidence that he failed to prove that his sole managing conservatorship would be a positive improvement. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361 (1960); St. John Garwood, *The Question of Insufficient Evidence on Appeal,* 30 TEX.L.REV. 803 (1952). *See also* William Powers, Jr., and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence",* 69 TEX.L.REV. 515 (1991).

This dissent has been written in conformity to the authorities immediately above. In passing upon factual insufficiency points and great weight and preponderance points our Supreme Court has delineated the role of courts of appeals. *In re King's Estate, su-*

*pra; Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986). But the Supreme Court recognized that in performing this role and task, it was not a simple matter to describe the mental and intellectual processes to be followed by the intermediate courts. This writer has assiduously tried to perform that difficult role.

The tenth point of error urged by the appellant advances the argument that the trial court erred in numerous ways throughout the trial which errors had a cumulative effect of denying Donna her full and fair day in court and which cumulative effects of numerous errors require a reversal of the judgment and a remand of the cause of action. Donna does ably complain of numerous errors and also numerous complaints and reasons which taken together do require reversal. Donna argues that this Court should consider and act upon the cumulative effect of all the errors in her trial.

The rule in Texas is well established that in a situation where a number of erroneous rulings and trial errors take place, having a cumulative effect of probably causing the rendition of an improper, wrong judgment, then the intermediate court of appeals should definitely consider the well-established doctrine of cumulative error and reverse and remand. *See and compare University of Texas at Austin v. Hinton,* 822 S.W.2d 197 (Tex.App.—Austin 1991, no writ).

The Supreme Court of Texas has long recognized the doctrine of cumulative error and its effect. *See and compare Castro v. Sebesta,* 808 S.W.2d 189, 192 n. 1 (Tex.App.—Houston [1st Dist.] 1991, no writ). Donna lists in her brief in succinct fashion eleven errors that she contends require a reversal. This dissenting opinion has attempted to discuss most of them. In my opinion the cumulative errors and the cumulative effect of the errors would require our Ninth Court of Appeals to reverse the judgment herein and remand the cause for a new trial as to Zach, but the judgment should be reversed and rendered in favor of Donna as to Matthew.

Donna is in the position of having to establish that the jury's findings to the three crucial issues were based on evidence that was so weak that the jury's findings could not be sustained on appeal. I think she has succeeded. An intermediate appellate court need not consider the evidence at trial that was barred and inadmissible by the rules of law or precedent or the rules of evidence; and if the evidence offered to establish a vital, crucial fact was no more than a scintilla, then that quality of evidence will not sustain the finding. Donna's point on factual insufficiency is solid and correct. Evidence lacking probative value and devoid of reliability—such as double hearsay—need not be considered.

Furthermore, it is not permissible to place inference upon inference in passing upon the factual sufficiency of the evidence. The record is replete that Donna took very good care of the children. Additionally, she took excellent care of them in regards to medical needs. There is a total dearth or lack of evidence that would sustain the answers to the issues as to Matthew. Furthermore, there is a lack of direct, credible evidence that Donna prompted or programmed the children. Circumstance stacked on circumstance is not probative evidence.

It is also significant that certain important reports made to the Child Protective Services were explained by a witness, Nancy Browning. She was called to the stand by Gene. Again, in regard to the allegations of injuries to Zachary, Ms. Browning testified in summary that the allegations were unfounded as against the mother.

Significantly, witness Brumley gave evidence that the child Zachary never stated that Donna or the grandmother was telling him what to say. Sergeant Davis had been assigned for a number of years to the Sex Crime Division of the Beaumont Police Department. For many years in the past he had dedicated 100 percent of his time to investigating sexual offenses stressing those alleged to have been committed against children. His testimony was favorable to Donna and unfavorable to Gene. The sergeant had helped establish and was on the original founding board of The Garth House which was dedicated to investigating alleged sexual offenses against young children.

The Garth House procedures were clearly shown to be very professional, thorough, and up-to-date. Sergeant Davis swore that if a child at a young age such as Zachary exhibits any inappropriate sexual behavior or makes such sexual statements, it would be altogether appropriate for a parent such as Donna to investigate and report those matters to C.P.S. at once. Donna had not acted to harass the father.

In brief summary, the sergeant testified that an accepted profile of a child molester is usually of a person who does not have a high self-esteem of himself or herself. But, in the domain of his own home, such a person can become very domineering and in many cases such a person abuses drugs or alcohol. He testified that one important consideration is that the abuse is very repetitious and simply does not stop with one incident and from his experience, he felt that such abuse is usually repeated until an investigation is conducted or something dramatic makes the abuse stop. He stated that there was a positive correlation between drug abuse and alcohol abuse and child molestations.

It is also noteworthy that the first doctor Donna took Zach to was Dr. Lane. This doctor had been referred to Donna by Nancy Browning of C.P.S. However, later, Donna was advised that she would be better off going to a more investigative type doctor.

It was then that Dr. Wills was consulted. Dr. Wills was the physician that stated that Zachary had inappropriate sexual knowledge. Donna was not the source of this sexual knowledge. Based upon this report of Dr. Wills, Donna began working closely with the workers at C.P.S. Donna's concern was appropriate and caring.

The record also reflects that in the course of time Gene began picking up the children and in doing so he was causing to be brought two cars, a video camera, and several other people. This proved to be disruptive in the exchange of the children for visitation purposes. It was Donna's family rather than Donna who had called the police to determine what could be done. The police said that one person should be allowed at the door. Gene's version differs.

A great amount of additional evidence mandates that Donna's points on "factual insufficiency" and "overwhelming weight" issues must be sustained.

It would serve no useful purpose to set this evidence out in detail. In my opinion, *Pool v. Ford Motor Co., supra,* and its requirements have been fully satisfied by Donna. Donna's brief, this record and this dissent, it is respectfully submitted fully satisfy *Pool v. Ford Motor Co. Id.* If it were not for the *Pool* decision, the recited matters would not have been set forth in this dissent.

The findings to jury questions one, two, and four in my view are clearly against the great weight and preponderance of the evidence. They are clearly wrong. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361 (1960), St. John Garwood, *The Question of Insufficient Evidence on Appeal,* 30 Tex.L.Rev. 803 (1952). *See also* William Powers, Jr., and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence",* 69 Tex.L.Rev. 515 (1991). Also, it was emphasized to Donna and she was told by C.P.S. workers that she had better get ready to protect her children and provide protection for her children. This obviously caused Donna to become very upset. Nancy Browning had told Donna that it was important to make efforts to protect her children without delay.

Again, there is no evidence and certainly insufficient factual evidence to support any of the jury's findings as they relate to Matthew. The record is overwhelmingly in favor of Donna without any questions as to Matthew and I opine also as to Zachary. Matthew had no problems or involvement in this drama of the unfortunate post-divorce problems. Donna had done nothing adverse to Matthew's welfare—the record so proves.

Also, Donna explained that a Detective Wilmore had told her to report everything relevant to a sexual abuse allegation. The reason Detective Wilmore gave was that he was the one that had a responsibility in investigating these types of allegations. Donna again followed the advice and instructions given to her by persons in authority.

The jury, I submit, erroneously found that Donna should be removed as sole managing conservator and Gene should be appointed as sole managing conservator. But the jury heard volumes of illegal pseudo-evidence. The jury was mislead. Donna made some mistakes but they were not so egregious as to warrant her removal and Gene's becoming sole managing conservator.

Stated in brief summary, the appellant urges the Ninth Court to consider the following in deciding point of error number ten:

1. Admitting the opinion of Dr. Gripon, who "observed" the children without consent of the Court or the consent of the managing conservator,

2. Allowing Dr. Gripon to testify even though Donna was not fully informed of his impressions and opinions in response to interrogatories,

3. Allowing Dr. Gripon to present testimony based on hearsay statements obtained from an unauthenticated tape that was prepared by Gene,

4. Not allowing Donna to make a bill of exceptions as to testimony of Cheryl Shultz,

5. Overruling Donna's objection to the testimony of Cheryl Shultz regarding hearsay statements of Zachary,

6. Commenting upon the testimony of Frank Stubbs, a witness for Donna and in limiting the admission of evidence,

7. Commenting on the weight of the evidence by the trial court's action toward Mike Matheny, the attorney representing Donna,

8. Allowing Dr. Bender to testify when Gene failed to respond to discovery requests fulling informing Donna of Dr. Bender's impressions and opinions,

9. Allowing Dr. Bender to testify based upon hearsay that he received from Gene,

10. Overruling Donna's objection to Gene's testimony regarding hearsay statements of Zachary,

11. Overruling Donna's objections to the secret tape made by Gene in the office of Dr. Frank Lane which included numerous hearsay statements of Gene, Melissa, and Cheryl Chance regarding alleged third party statements made by Zachary, Nancy Browning, Wanda Brumley, and Stuart Umlauf,

12. Overruling Donna's request and motion to disregard all hearsay statements previously allowed into evidence by the Court,

13. Refusing Donna's requested jury instructions,

14. Submitting the instruction regarding the child's hearsay statements.

In my view, this point of error ten should be sustained in toto. This point of error, standing alone, requires a reversal.

The clandestine, secret tape of Zach is revisited in the fifth portion of the unpublished part of this dissent.

### The Inadmissibility of the Unproduced Zach Tape

Nor does the challenged, clandestinely made by Gene (of Zach's hearsay) contrived tape qualify under Tex.R.Civ.Evid. 803(3). Zach's statements were about alleged past, physical acts, not about existing state of mind or emotion, or physical conditions or existing mental conditions. Zach was certainly not making statements for the purpose of medical diagnosis or treatments. Zach sought no treatment from Dr. Gripon. No sub-section of Rule 803 saves the tape. The tape cannot even become admissible evidence under Tex. R.Civ.Evid. 805, entitled "Hearsay within Hearsay". The combined parts did not conform to an exception to the hearsay rule. Dr. Gripon's opinions were more than just weak under the rules of evidence. Never once did the doctor state that his views, opinions, or inferences were within the realm of reasonable medical probability. He spoke of possibilities—not medical probabilities.

Appellee insists that the determination of questions of admissibility generally lies within the sound discretion of the trial court. The admissibility of evidence must as a preliminary matter be determined by the court. But, Tex.R.Civ.Evid. 104 provides that this discretion is subject to the provision of subdivision (b) of Rule 104. Rule 104(b) requires

that when the relevancy or admissibility of the evidence depends upon the fulfillment of a condition of fact, the court must see to it that the introduction of that evidence is, in turn, supported by evidence sufficient to support a finding of the fulfillment of the condition of the fact or facts. Rule 104(b) was not heeded. Rule 802, the Hearsay Rule, provides that *hearsay is not admissible* except under certain exceptions not applicable to the unauthenticated, unproduced tape by Zach's double hearsay. It is acknowledged by Gene that the discretion of the trial court is reviewable under the abuse of discretion standard. As discussed above, the bootstrapped hearsay statements were not admissible under any guiding rules. This type of hearsay was not remotely shown to be a base used by experts. Hence, the discretion was abused and error resulted. The same defects apply to Ph.D. Bender and the secret tape taken in Dr. Lane's office.

To support his argument on the abuse of discretion standard, appellee places reliance on *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The *Downer* case dealt with the imposition of sanctions. The trial judge in *Downer* struck AquaMarine's answers after AquaMarine had repeatedly failed to produce crew members and the captain of the vessel Four Point IV for depositions. The litigation involved a drowned seaman, Downer, who was attempting to free a line that had fowled in the vessel's propeller. The trial judge had entered an interlocutory judgment on liability after striking AquaMarine's answer. The Downer case has nothing to do with the admissibility of double hearsay or double or triple hearsay's use as a basis for an opinion of either a lay witness or an expert witness.

The opinion in *Downer* was about the *trial judge's guiding rules in imposing sanctions* such as striking the defendant's answers as a result of repeated discovery violations. The case of *Downer* is inapposite. In view of the above discussion, it is this writer's opinion that the trial court acted without reference to guiding rules and principles of the admissibility of evidence, either lay or expert, either by way of opinion or otherwise. These evidence rulings below conflicted with Tex.R.Civ.Evid. 801(d), 802, 803(1), (3), (4), 805; Tex.Fam. Code § 11.14(c), (e). With deference, abuse of discretion is shown. Section 11.14(e) mandates that the rules of evidence apply. Appellant's points of error one, five, six, and seven, attacking the evidence of Gripon, Bender, the surreptitious tape of Dr. Lane, the unauthenticated, clandestine tape of Zach, are sound and solid; they should be upheld. Donna has a right to have the custody issues of her very young boys tried in accordance with law and the Family Code.

The critical importance of the contrived, manipulated tape of Zach to Gripon and to Gripon's evidence is demonstrated by Gene's counsel arguing" ... the court telling the jury to disregard an opinion of Dr. Gripon regarding the taped statements of the child, Zachary, when that is absolutely necessary for that man to be able to hear those statements in order to properly treat my client and to realize or to understand what the effect and impact that is having upon these— his patients." *But the very young* boys were never the patients of the psychiatrist. Thus, it was substantial, reversible error to allow the testimony of Dr. Gripon before the jury. The testimony of Dr. Gripon could have been taken by way of deposition and thus by a proper procedural method. *See and compare Huber v. Buder,* 434 S.W.2d 177 (Tex. Civ.App.—Fort Worth 1968, writ ref'd n.r.e.). In this record, in view of the questions propounded by Gene's counsel, it is clear that these double hearsay statements were used as the truth of the matters stated and asserted therein.

Zach's statements on the diaper bag tapes were properly proved and admissible; the tape of Zach relied on by Dr. Gripon was not. This distinction must be constantly borne in mind.

In appellant's brief Donna unequivocally states that the tape in question was never produced, never authenticated, and never heard by her. *This statement in the appellant's original brief was not challenged by the appellee.* Therefore, this statement may be accepted by the appeals court as being correct. Tex.R.App.P. 74(f).

Among other defects and grave deficiencies of the tapes (of Zach) relied on by appellee, it was not shown that the operator of the device, or tape, was competent, that the recording or tape was authenticated as to its correctness, that no changes, additions, or deletions had been made in the tape or on the tape, the manner of preservation of the tape or the recording and that the testimony of Zach was voluntary and was made without any kind of inducement. Most of these defects apply to Dr. Lane's tape.

These imperfections, serious defects, and elements of inadmissibility are to be considered and weighed in applying the standard of abuse of discretion. *See and compare Seymour v. Gillespie,* 608 S.W.2d 897 (Tex.1980). It has been squarely held that the above guidelines and standards are applicable to a tape recording of a child or of a dialogue between the child and a parent in a child custody proceeding. *Interest of T.L.H., supra.*

Moreover, the personal history of Gene and his history of medical problems to Dr. Gripon is strictly and solely for the doctor to consider in determining the treatment or diagnosis of Gene. Such a medical history of Gene is not admissible evidence of the truth of those hearsay statements or medical histories of Gene. But this hearsay came in for all purposes.

By way of interrogatories, Donna asked for the subject matter on which any expert was expected to testify and in addition to reveal any such expert's impressions and opinions. The answer made by Gene concerning Gripon and Bender failed to comply with the interrogatories concerning the mental impression and opinions of the experts. Thus, the rules of discovery were violated.

In civil cases, Texas courts have recognized a limited exception to the hearsay rule for statements made by a *patient* to a *physician for purposes of medical diagnosis and treatment.* The exception is limited to the reasonable, pertinent statements to explain the diagnosis or treatment. The exception does not permit these statements in evidence as proof of the truth thereof. TEX.R.CIV. EVID. 803(4). But note that a patient-physician relationship had to exist. The trial

court failed to make this distinction and failed to give the proper instruction. Furthermore, the statements had to be made by the patient to his physician. The young boys were not patients of Gripon; nor did they talk with Gripon or Bender. The testimonies of Gripon and Bender were put before the jury. Controlling guidelines were not followed.

Statements as to fault or wrongdoing simply do not qualify under TEX.R.CIV.EVID. 803(3), (4). A statement of memory or belief to prove a fact, remembered or believed, is not an exception to the hearsay rule. TEX. R.CIV.EVID. 803(3). Of paramount impact, there is no evidence of any wrongdoing by Donna as to Matthew. *See and compare Fleming v. State, supra.*

### The Questions on Dr. Bender's Testimony and Issues of Admissibility Revisited

The court out of the presence of the jury *admonished* Dr. Bender that the trial court had to follow certain rules of procedure in Texas and that he had been designated as an expert to testify concerning his *research on false accusations of abuse.* The court further admonished this doctor of philosophy in special education that the Ph.D. could not give other information.

The court said: "But I cannot permit you to go into other matters pertaining to parenting and so forth. Do you understand?" Bender: "Yes, sir." The Ph.D. testified about research papers demonstrating certain percentages of false accusations in family court proceedings. But the doctor then testified that false allegations were very destructive for the two boys here. This was not within the scope of the response to the interrogatory. Bender violated the court's admonitions. He further testified that these allegations will result in the separation of the children from the parent who is accused. The Ph.D. further stated that the separation and absence of a parent that a child loves, when based upon false accusations, does injury to the child.

Donna's attorney made proper objection that it was not responsive to the question and that this opinion was outside the perimeters

of the relevant answers and designations to Donna's interrogatories. Whereupon the court overruled the objection. The trial court had changed his position 180 degrees. Query: What happened to the admonitions?

Then the Ph.D. testified at length and beyond his designated area. The Ph.D. further testified that one of the most difficult things about the sex abuse problem involving children is that the children even love the parents that are actually abusing them. But, when a false accusation is made, such an accusation is malicious and is an intentional tactic and results in very severe injury to children.

Then, entirely outside of his designated expertise, the doctor said that a parent that would use false accusations of sexual abuse against the other parent shows that parent is in some sense mentally unbalanced. Thus Bender charged Donna with mental imbalance. Dr. Bender was certainly not under the rules of discovery qualified or even permitted to pass on Donna's mental status. Donna was acting as a concerning mother. Bender was not an M.D. Then, the doctor was asked to compare his research dealing with false accusation to the Chance children. A proper objection was made that this witness was not qualified to give that opinion and that he had not been designated or identified to give his opinion on the specifics on this case *but only on his research dealing with false accusations generally*. Again, the court's admonitions were abandoned. I submit the objection was good; it was overruled.

When asked about what information he had or was making reference to concerning the Chance children, Dr. Bender said that he had talked with Mr. Smith about the case and that he had read reports from the child protective services. The doctor had read *some* testimony of a Mrs. Kendall. He had read a court pleading which was said to be an application by Donna for protective orders.

He had a "structured interview" with Gene. The doctor stated that the structured interview is one of diagnostic procedure. A proper, valid objection was made that Dr. Bender had not been qualified as a diagnostician, that he had not been licensed as a diagnostic expert nor designated as such.

The doctor's Ph.D. was in *special education.* Bender was not a medical doctor. This Ph.D. did not show that these hearsay matters and Donna's pleadings were a valid basis for his opinions. The objection was overruled; error was committed.

The doctor then proceeded to give his opinion based on his "diagnostic" procedure. He testified concerning his opinion based on a history of Gene's first family by which the doctor meant the family in which Mr. Gene Chance was raised. The first family history dealt with Gene's parents and upbringing. The objection was made that the statements were out-of-court statements and were hearsay. Donna was not present. No exception to the hearsay rule was shown by the movant petitioner; nevertheless, the objections were overruled and a running bill of exception was granted. No contention or argument was made by Gene that this hearsay was an exception under Rule 803(3). Gene's parents were not subject to cross-examination.

It is abundantly clear that from the response (to Donna's interrogatories) made concerning Dr. Bender that Donna could not have dreamed that this Ph.D. would testify concerning "diagnostic" procedures and the history of Gene's first family of origin. Moreover, Dr. Bender was called only as a Ph.D. in special education and not for the purposes of medical diagnosis or treatment or medical expert evidence. Bender had no medical background. Nevertheless, over objection, Dr. Bender specifically stated that there was a lack of *any medical evidence* of abuse by Gene. He had not been able to substantiate from any *medical evidence* any abuse such as semen in the rectal area. He never examined or talked to the boys. He was allowed to give his opinion which was, "... there is no reason to believe anything other than that these are false allegations." Bender was referring to Donna's position. His opinions were based on double hearsay. Bender was a testifying witness, not a treating physicians. Bender's testimony violated Tex.R.Civ.Evid. 801, 802, 803(4), 805, 803(1), (3).

Thus, reversible error occurred. *See and compare In re A.V.,* 849 S.W.2d 393, 404–405

(Tex.App.—Fort Worth 1993, no writ); *Chapman v. Paul R. Wilson, Jr., D.D.S., Inc.,* 826 S.W.2d 214 (Tex.App.—Austin 1992, writ denied). Also Tex.R.Civ.P. 215 requires exclusion of such evidence. *See Alvarado v. Farah Manufacturing Co.,* 830 S.W.2d 911 (Tex.1992). Simply stated it was error to allow Dr. Bender to testify before a jury as he did because his evidence plainly went beyond the interrogatory answers and his designation as an expert. His testimony went far beyond the trial court's initial rulings and admonitions and virtually all of his testimony *could not have been anticipated* by Donna. This Ph.D. actually passed upon and testified about medical records and medical evidence that could not have been anticipated. The basic rules of discovery were violated.

Bender in no way was qualified to do that. This Ph.D.'s testimony read like that of a doctor of medicine. He voiced medical opinions without seeing the boys; he pronounced Donna mentally unbalanced without interviewing her. This is serious error and in my opinion requires reversal because it was clearly damaging to Donna and left the definite impression with the jury that Donna had made false allegations of sexual abuse against Gene—all based on rank hearsay doubled. Bender was not a health care provider. He was a teacher. Rule 166b was violated.

Clearly Dr. Bender had based his opinion on only about three or four hours of conversations—some by long-distance phone. The conversations were with Gene or his lawyer. Bender lived in Georgia. This Ph.D. could not qualify under Tex.R.Civ.Evid. 803(3), (4). Bender could not give evidence as a medical doctor. Gene was not his patient.

But, there were other imperfections and fatal flaws in Bender's testimony. The doctor admitted that he himself had never conducted any research concerning sexual abuse in divorce proceedings or family litigation to ascertain whether or not such allegations are false or true. Dr. Bender declined to even consider the report of Dr. Wills. He out of hand dismissed the evaluation and report of Dr. Wills.

But it is noteworthy and significant that Dr. Wills found that in substance Zachary appeared somewhat troubled and that Zachary questioned why he was obliged to talk about something that he does not want to discuss *and has been told by his father not to talk about these things.* Dr. Wills stated that Zachary's fear to discuss the important issues was and is apparent. Upon observation of Zachary during Zachary's free play, Wills reached the conclusion that Zach was beginning to incorporate inappropriate sexual behavior. Bender ignored this evidence.

From a critical portion of Dr. Bender's testimony, it was clearly apparent that this doctor was testifying to much hearsay relative to the structured interview. A proper objection was made by Donna. Then, *Gene's counsel stated in substance, we are talking about a party, apparently* taking the position that a party to the law suit is not subject to the hearsay rule. Again, Donna's counsel pointed out that the testimony was clearly hearsay and that there existed no valid exception to the hearsay rule. Whereupon the court overruled that objection. However, at that point, the court gave a full running bill. Dr. Bender then proceeded to give certain testimony about the parents of Gene.

The Ph.D. acknowledged *that there was a very small body of knowledge upon which he based his testimony* and that this very small body of knowledge pertained to false allegations of abuse but that small body of knowledge *did not specifically involve children three years of age or younger.*

When asked about researching false allegations involving children three years of age or younger, his answer was, "That's a tough one and I would hesitate to answer. I'm trying to think of any study that restricted itself to that age or younger, and right now I can't think of one. I know of studies that included that." He further acknowledged that he knew of no empirically based studies involving allegations involving children three years of age or younger.

Even though Dr. Bender had read a published article by Dr. Wills and agreed with it, Dr. Bender declined to consider Dr. Wills' report on the Chance children. Dr. Wills'

report in important, relevant part read (dealing with the boys and Gene):

Section on conclusions and recommendation is based upon the results of the evaluation. It is my opinion that this three year old child is demonstrating and verbalizing behaviors which are extremely alarming.

Many of these behaviors are consistent with children who have been exposed to improper sexual conduct. The situation involving the parent-child relationship needs to be investigated. I would highly recommend a neutral party be appointed to examine the issues.

Bender ignored this opinion of Dr. Wills who had actually seen and followed the child involved. Dr. Bender refused to consider Dr. Wills' report even though it is clear that the report was based on Dr. Wills' actual observation of Zachary and of his free play. Dr. Wills' evidence was favorable to Donna, but unfavorable to Gene.

For the reasons and facts set out above, Dr. Bender's testimony should not have gone before the jury. The guidelines were not heeded. In my opinion, point of error five should be sustained.

Donna, in point six, maintains that the trial court erred in overruling her objections to a secret tape made by Gene in the office of Dr. Frank Lane. Donna urges that the tape contains self-serving hearsay statements by Gene, Melissa, and Cheryl Chance (Gene's sister) regarding and relevant to alleged third party hearsay statements of Zachary, Nancy Browning, Wanda Brumley, and Stuart Umlauf; that the secret tape violated the physician-patient privilege and violated public policy. Donna also states that the trial court had a pre-disposition adverse to and against Dr. Lane's testimony.

Gene introduced this tape into evidence. He had clandestinely made this tape in the office of Dr. Lane. Dr. Lane was a psychiatrist to whom the children were referred by Child Protective Agency. The interview with Dr. Lane lasted at least 30 minutes. It was taped by Gene without Dr. Lane's knowledge, permission or consent. The tape made in Dr. Lane's office was used as a vehicle to voice Gene's complaints. The tape contains many self-serving statements of Gene, his

girlfriend, and his sister. Melissa's utterances are clearly hearsay. The statements about Zach's chafed penis and marks on Zach's anus were hearsay, damaging to Donna. This tape apparently was planned; *it was about Zach only*. Religion and denominations are discussed. Dr. Lane, not aware he was being recorded, said one very popular religious denomination "was against everything." This should not have gone to the jury. Donna's points five and six should be upheld.

The parts of this dissent relative to Dr. Gripon and Dr. Bender had to be set out in detail and fully demonstrate violations of the abuse of discretion standard. The "no evidence" and "factual insufficiency" points demanded detailing under *Pool v. Ford Motor Co., supra.*

It really takes a great amount of time in reading this record. In this writer's opinion, Donna did not get a fair trial or her full day in court. This is without any criticism of anyone.

Donna absolutely did not receive a legal, lawful, correct trial. The Civil Rules of Evidence, the Texas Family Code, the Discovery Rules, the rules and Donna's rights on Bills of Exceptions were repeatedly violated.

Appellee argues that the trial bench had to maintain control of the trial, which justified the court's comments, statements, and remarks above set out. But the record fails to support that argument.

This dissent is filed with respect; this record justifies my writing separately.

The rest of this dissenting opinion is ordered *not* to be published. The unpublished portion of this dissent is in response to a motion filed by appellee.

## ORDER

### ON MOTION FOR REHEARING

PER CURIAM.

A majority of the court withdraws the order of October 12, 1995, granting the Motion for rehearing of the appellant, Donna Rene Chance. The motion for rehearing is

overruled. The majority opinion of July 20, 1995, is reinstated. The dissent of October 12, 1995, is reinstated. No further motions for rehearing will be entertained. TEX. R.APP.P. 100(d).